## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DORA; ALMA; BEATRIZ; CARLA;
ESPERANZA; FANY; GINA; HELENA; ISIDRA;
JENIFER; KARA; LINDA; MINDY; NORA;
ORELIA; PATRICIA; QUELA; RITA; SYLVIA;
TANIA; ULA; VICTORIA; WILMA; XIOMARA;
YADIRA; ZANDRA; ALEX; BENJAMIN;
CARLOS;

Plaintiffs,

v.

JEFFERSON B. SESSIONS, III, in his official
capacity as the Attorney General,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

KIRSTJEN NIELSEN, in her official capacity as
the Secretary of the Department of Homeland
Security,
245 Murray Lane, SW
Washington, DC 20528;

RONALD VITIELLO, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
500 12th Street, SW
Washington, DC 20536;

L. FRANCIS CISSNA, in his official capacity as
the Acting Director of U.S. Citizenship and
Immigration Services,
20 Massachusetts Ave., NW, Rm 4210; MS: 2120
Washington, DC 20529;

KEVIN K. MCALEENAN, in his official capacity
as Commissioner of U.S. Customs and Border
Protection,
1300 Pennsylvania Ave., NW, MS: 1345
Washington, DC 20229,

Defendants.

Case: 1:18−cv−01938
Assigned To : Friedman, Paul L.
Assign. Date : 8/17/2018
Description: Gen. Civil

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs in this action are asylum seekers who, under Defendants' "zero tolerance" policy, were forcibly separated from their children by government officials after they came to the United States fleeing violence and persecution. During the time they were separated from their children— and in many cases before they even knew where their children had been taken—Defendants pushed them through screening interviews known as credible fear interviews. These credible fear interviews were their only opportunity to avoid expedited removal back to their home countries by demonstrating that they have a credible fear of persecution on account of a protected ground.

2.      At the time of their credible fear interviews, Plaintiffs were suffering from extreme trauma caused by the Defendants forcibly separating them from their children. But Defendants pushed them through their credible fear interviews under these circumstances, effectively depriving them of a meaningful opportunity to apply for the protection of asylum. During their interviews, Plaintiffs were consumed by fear for their children, and could only think about where their children were, whether they were in danger, whether they would see them again, and whether they might be forced to leave the country without them.

3.      Because of their trauma and other resulting psychological conditions, Plaintiffs were unable to fully and competently participate in their credible fear interviews. They could not articulate their stories to the interviewing officers or even focus on the questions being asked. Many did not understand the questions or the purpose of the interviews. Others could not even remember what happened during their interviews. Instead, all they could think about was their children. And yet Defendants issued negative credible fear determinations based on these interviews, and now intend to summarily deport Plaintiffs from the United States.

4.     In this action, Plaintiffs challenge Defendants' systemic and unlawful policy of continuing to process parents quickly for removal and to reunify them with their children only "for the purpose of removal" after they had already received a deportation order. Plaintiffs also challenge Defendants' systemic unlawful policy of pushing traumatized parents through credible fear interviews before they were reunified with their children, when they were not competent to participate in such interviews, and without any accommodations for the trauma and other psychological conditions caused by their separation from their children. Plaintiffs further challenge Defendants' systemic unlawful policy of relying on those defective credible fear interviews to issue expedited orders of removal, thereby depriving Plaintiffs of a meaningful opportunity to apply for the protection of asylum. These policies are in violation of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*; and the Due Process Clause of the Fifth Amendment of the United States Constitution.

5.     Plaintiffs respectfully request that this Court declare Defendants' policies to be in violation of law and enjoin further application of these policies to Plaintiffs and other separated parents. Plaintiffs further request an Order compelling Defendants to vacate Plaintiffs' and other separated parents' negative credible fear determinations and orders of removal, and to provide a new opportunity for credible fear interviews with reasonable accommodations to Plaintiffs and other parents who received negative credible fear determinations while they were separated from their children.

6.     This case is related to *M.M.M. et al. v. Sessions, et al.,* No. 1:18-cv-1835-PLF (D.D.C. filed Aug. 3, 2018), which is currently pending before this Court. *M.M.M.* challenges Defendants' policy of stripping children of their rights to seek asylum independently of their parents. This

complementary case is brought on behalf of parents who have received expedited removal orders as a result of Defendants' unlawful policies, as alleged more fully below.

## JURISDICTION AND VENUE

7.     This action arises under the United States Constitution; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

8.     This Court has subject-matter jurisdiction pursuant to 8 U.S.C. § 1252(e)(3) (systemic challenges to 8 U.S.C. § 1225(b)) and pursuant to 28 U.S.C. § 1331 (federal question).

9.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3) requires that all systemic challenges be brought in the United States District Court for the District of Columbia. Venue is also proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants reside in this district and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

### I.     Plaintiffs

10.     Plaintiff "Dora" is a Honduran asylum seeker who came to the United States with her seven-year-old son fleeing extreme domestic violence and abuse. She was forcibly separated from her child and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently released on an order of supervision. She is subject to deportation at any time.

11.     Plaintiff "Alma" is a Honduran asylum seeker who came to the United States with her seven-year-old and nine-year-old boys fleeing multiple forms of persecution. She was forcibly separated from her children and went through her credible fear interview while extremely

traumatized by that separation. She received a negative credible fear determination and is currently released on an order of supervision. She is subject to deportation at any time.

12.    Plaintiff "Beatriz" is a Salvadoran asylum seeker who came to the United States with her nine-year-old daughter fleeing persecution by the military, by her husband, and by her husband's gang. She was forcibly separated from her child and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

13.    Plaintiff "Carla" is a Honduran asylum seeker who came to the United States with her eight-year-old son fleeing multiple forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

14.    Plaintiff "Esperanza" is a Guatemalan asylum seeker who came to the United States with her six-year-old son fleeing horrible sexual violence and other forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

15.    Plaintiff "Fany" is a Honduran asylum seeker who came to the United States with her twelve-year-old daughter fleeing severe racially-motivated persecution and death threats. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

16.    Plaintiff "Gina" is a Salvadoran asylum seeker who came to the United States with her ten-year-old son fleeing gang extortion and death threats and other persecution. She was forcibly

separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

17.    Plaintiff "Helena" is a Honduran asylum seeker who came to the United States with her sixteen-year-old son fleeing horrific gang violence, including the murder of her family members, as well as multiple forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

18.    Plaintiff "Isidra" is a Honduran asylum seeker who came to the United States with her fourteen-year-old daughter fleeing domestic violence and multiple forms of persecution. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

19.    Plaintiff "Jenifer" is a Honduran asylum seeker who came to the United States with her seven-year-old daughter and ten-year-old son fleeing multiple forms of persecution. She was forcibly separated from her children and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

20.    Plaintiff "Kara" is a Honduran asylum seeker who came to the United States with her thirteen-year-old daughter fleeing persecution on account of her political opinion. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

21.    Plaintiff "Linda" is a Honduran asylum seeker who came to the United States with her seven-year-old son fleeing persecution on account of her political opinion. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

22.    Plaintiff "Mindy" is a Honduran asylum seeker who came to the United States with her sixteen-year-old son fleeing multiple forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

23.    Plaintiff "Nora" is a Salvadoran asylum seeker who came to the United States with her six-year-old daughter fleeing multiple forms of persecution. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

24.    Plaintiff "Orelia" is a Honduran asylum seeker who came to the United States with her thirteen-year-old son fleeing multiples forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

25.    Plaintiff "Patricia" is a Salvadoran asylum seeker who came to the United States with her fourteen-year-old son fleeing persecution on account of her sexual orientation and multiple other protected grounds. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

26.     Plaintiff "Quela" is a Guatemalan asylum seeker who came to the United States with her seventeen-year-old son fleeing multiple forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

27.     Plaintiff "Rita" is a Guatemalan asylum seeker who came to the United States with her thirteen-year old son fleeing multiple forms of persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

28.     Plaintiff "Sylvia" is a Guatemalan asylum seeker who came to the United States with her nine-year-old daughter fleeing persecution on account of multiple protected grounds. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

29.     Plaintiff "Tania" is a Guatemalan asylum seeker who came to the United States with her six-year-old son fleeing persecution on account of multiple protected grounds. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

30.     Plaintiff "Ula" is a Honduran asylum seeker who came to the United States with her eight-year-old daughter fleeing multiple forms of extreme persecution, including the murder of her family member. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

31.     Plaintiff "Victoria" is a Guatemalan asylum seeker who came to the United States with her eight-year-old son fleeing rape, incest, and persecution on account of her faith. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

32.     Plaintiff "Wilma" is a Honduran asylum seeker who came to the United States with her ten-year-old son fleeing severe domestic violence and abuse. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

33.     Plaintiff "Xiomara" is a Honduran asylum seeker who came to the United States with her fourteen-year-old daughter and six-year-old son fleeing persecution on account of multiple protected grounds. She was forcibly separated from her children and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

34.     Plaintiff "Yadira" is a Guatemalan asylum seeker who came to the United States with her nine-year-old son fleeing targeted gang violence and persecution. She was forcibly separated from her son and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

35.     Plaintiff "Zandra" is a Honduran asylum seeker who came to the United States with her ten-year-old daughter fleeing persecution. She was forcibly separated from her daughter and went through her credible fear interview while extremely traumatized by that separation. She received a negative credible fear determination and is currently detained at Dilley.

36.     Plaintiff "Alex" is a Honduran asylum seeker who came to the United States with his six-year-old son fleeing gang violence and persecution. He was forcibly separated from his son and went through his credible fear interview while extremely traumatized by that separation. He received a negative credible fear determination and is currently detained at the Karnes County Residential Center ("Karnes").

37.     Plaintiff "Benjamin" is a Guatemalan asylum seeker who came to the United States with his fourteen-year-old son fleeing gang violence and persecution on account of multiple protected grounds. He was forcibly separated from his son and went through his credible fear interview while extremely traumatized by that separation. He received a negative credible fear determination and is currently detained at Karnes.

38.     Plaintiff "Carlos" is a Honduran asylum seeker who came to the United States with his eight-year-old son fleeing violence and persecution. He was forcibly separated from his son and went through his credible fear interview while extremely traumatized by that separation. He received a negative credible fear determination and is currently detained at Karnes.

## II.     Defendants

39.     Defendant Jefferson Beauregard Sessions, III is the Attorney General of the United States. In that capacity, he is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103, including laws relating to expedited removal and the credible fear interview process. He is sued in his official capacity.

40.     Defendant Kirstjen Nielsen is the Secretary of the Department of Homeland Security ("DHS"). In this capacity, she is responsible for directing component agencies within DHS, including Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), and is responsible for the

administration of immigration laws, including laws relating to expedited removal and the credible fear interview process. She is sued in her official capacity.

41.     Defendant Ronald Vitiello is the Acting Director of ICE. In this capacity, he is responsible for the enforcement of immigration laws, including the referral for prosecution of asylum seekers who cross the United States border. He is sued in his official capacity.

42.     Defendant L. Francis Cissna is the Director of USCIS. In this capacity, he is responsible for overseeing the asylum officers who conduct credible fear interviews of individuals placed in expedited removal proceedings to determine whether they have a credible fear of persecution and should be permitted to apply for asylum before an immigration judge. He is sued in his official capacity.

43.     Defendant Kevin K. McAleenan is the Commissioner of CBP. In this capacity, he oversees the agency responsible for securing the border and the officials who apprehend and detain or release asylum seekers who cross the United States border. He is sued in his official capacity.

## FACTUAL BACKGROUND

I.     **Plaintiffs Fleeing Violence and Death Were Forcibly Separated From Their Children and Severely Traumatized By That Separation.**

44.     Plaintiffs in this action are all asylum seekers who crossed the U.S. border between May and July 2018 fleeing multiple forms of persecution and violence, were forcibly separated from their children, received a credible fear interview ("CFI") during the time they were separated from their children, and received a negative credible fear determination.

45.     All were suffering from trauma related to their separation from their children at the time of their interview, and had difficulty focusing on anything other than the whereabouts and well-being of their children. Most had fled at least in part to protect their children from harm in their home

countries, and the experience of having their children taken away from them was consequently particularly traumatizing.

46.   Many had symptoms of acute stress response and corresponding cognitive impairments, making them fundamentally unable to meaningfully participate in a credible fear interview. Decl. of Amy J. Cohen, M.D. ("Cohen Decl."), attached hereto as "Exhibit A," at 1-3. Among the representative sample of parents interviewed by Dr. Cohen, "[e]very single parent described the moment that their children were taken from them as the single most vividly horrifying experience of their lives: 'shattering', 'unbearable', 'a nightmare'." *Id.* at 1.

47.   This forcible separation that lasted for months caused Plaintiffs to suffer serious psychological and cognitive impairments that rendered them not competent to participate in their credible fear interviews. *Id.* at 3.

48.   Plaintiffs in this action were also adversely impacted by unlawful federal government policies implementing the Attorney General's decision in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), which seeks to unilaterally and unlawfully eliminate asylum for protected grounds relating to domestic violence and gang violence, and encourages asylum officers to make negative credible fear findings for individuals fleeing on account of this type of persecution. These policies made it especially difficult for Plaintiffs, particularly in their traumatized condition, to articulate the grounds on which they feared persecution in their home countries. *See Grace v. Sessions*, 1:18-cv-01853-EGS (D.D.C. filed Aug. 7, 2018). They were further prejudiced by their inability to consult with their children during their interviews.

49.   Nonetheless, Defendants continued to conduct their credible fear interviews without providing any reasonable accommodations for their disabilities.

***Plaintiff "Dora"***

12

50.     Dora fled Honduras after suffering extraordinary violence at the hands of her husband for years, including violence and threats of violence against her children. She was unable to obtain protection from the police.  She came to the United States in June 2018 with her seven-year-old son, whom she brought with her in order to rescue him from the violence and trauma he had endured.

51.     When she arrived at the border, Dora turned herself over willingly to immigration agents, telling them that she is here to seek asylum. When she learned that they might take her child away, she begged and pleaded with them not to separate them, attempting to explain that her son had been through many horrible experiences and needed to be with her. Ignoring her pleas, CBP officials forcibly separated her from him, and as he was being taken away, one CBP official told her that she deserved to lose her child and would not see him again until he is eighteen years old.

52.     Dora experienced extreme mental and emotional distress as a result of being separated from her son. She was intensely anxious and afraid for him, and worried that he was being further traumatized by their separation from each other.

53.     Dora was unable to speak to her son for almost two weeks. When they finally did speak, it was for a very brief phone call, in which he told her that an official threatened to hit with a belt any children who cried, and that he was being very good and not crying so that he could avoid being hit. Dora was incredibly distressed by this, particularly given her son's past experiences of violence.

54.     Dora's credible fear interview took place very shortly after she had spoken to her son for the first time. She was still profoundly distressed by the phone call and weeping, and she could not hear or understand what the interviewer was asking her. She expressed her confusion to the interviewer multiple times. She could not focus and felt lightheaded throughout the interview,

and could not think of anything other than her son.

55.     A psychiatrist who evaluated Dora concluded that she was suffering from severe acute stress response at the time of her interview and was not competent to participate in such an interview.

56.     Dora received a negative credible fear determination, which was affirmed by an immigration judge. She was recently reunited with her son and has been released on an order of supervision. She is required to check in regularly with ICE and is subject to deportation at any time.

*Plaintiff "Alma"*

57.     Alma fled Honduras with her two boys, aged seven and nine, because of violence and persecution she and her family members endured. She arrived in the United States in June 2018. The next morning, she was taken to court for prosecution for illegal entry. When she returned to the CBP facility, her children had disappeared. She began to inquire about her children's location and a CBP officer told her she would not get her children back, because they would stay in the United States while she would be deported. After twenty-eight days of no information about her children's whereabouts or wellbeing, a social worker helped her have a one-minute call with her nine-year-old, who asked her when they would be together and stated he wanted to leave the facility.

58.     At the time of her credible fear interview, Alma was separated from her children and unable to focus on anything other than that separation. She was later diagnosed with post-traumatic stress disorder ("PTSD") because of this separation, with strong indications that she was suffering from acute, debilitating trauma at the time of her interview. Alma reported symptoms including re-experiencing the trauma of separation, avoidance, alterations in mood

and cognition, hyperarousal, and dissociation. She still experiences an accelerated heartrate and headache when she is reminded of the experience of losing her children, and experiences ongoing, significant stress about the potential of being separated from her children again.

59.     Alma received a negative credible fear determination, which was affirmed by an immigration judge.

60.     Alma was recently reunited with her children, and was released on an order of supervision. She is required to check in regularly with ICE and is subject to deportation at any time.

### Plaintiff "Beatriz"

61.     Beatriz fled El Salvador with her nine-year-old daughter to escape persecution by the Salvadoran military and by her abusive husband and his gang. When she arrived in the United States in May 2018, Defendants immediately separated Beatriz from her daughter. After attending a hearing, Beatriz returned to find her daughter had disappeared. She did not eat for three days after the disappearance, lost her will to do anything, and had difficulty focusing.

62.     Beatriz had fled El Salvador in part because of her husband's abuse of her daughter, and she had vowed to never allow anyone to harm her again, but was now powerless to protect her. CBP officials would not tell her where her daughter was. Beatriz vividly imagined what her daughter was going through by extrapolating from the harsh conditions of her own confinement, and worried constantly.

63.     At the time of her credible fear interview, Beatriz had been separated from her daughter for a month. Experiencing severe emotional distress and trauma because of this forced separation, she was not articulate during the interview. The only facts that were fresh in her mind

were associated with her daughter, namely that her husband repeatedly beat the girl and that she was now lost. She had extreme difficulty focusing on or recalling any other aspects of her story.

64.     Despite Beatriz's symptoms of trauma, the asylum officer repeatedly interrupted her during the interview, and compelled her to answer all of her questions with either "yes" or "no." Despite her best effort, the disastrous circumstances of the interview and her disabling and all-consuming focus on her child resulted in an incomplete record. She received a negative credible fear determination, which was affirmed by an immigration judge.

65.     Beatriz was recently reunited with her child and is currently detained with her at Dilley.

*Plaintiff "Carla"*

66.     Carla fled Honduras with her eight-year-old son to escape persecution by her ex-partner on the basis of her race, religion, and other protected grounds. Her ex-partner repeatedly beat her, raped her, and threatened her son. She attempted to flee and hide from him twice, but both times he was able to find her. She fears for her life and her son's life if they return to Honduras. When she arrived in the United States in May 2018, Defendants took her son away from her, and she remained separated from him for months.

67.     At the time of her credible fear interview, Carla had not seen her son for weeks, and was experiencing severe distress at her separation from him. During the interview, she felt completely overwhelmed and could not focus on the questions being asked or think clearly. She expressed her desire to see her son and speak with him. The asylum officer stated that she would appear before a judge, and if the judge deported her, her son would stay in the United States without her and she would not see him again. She thought the officer was trying to intimidate her, and she was in fact terrified during the interview. She received a negative credible fear determination, which was affirmed by an immigration judge.

68.     Carla was recently reunified with her child and is currently detained at Dilley.

*Plaintiff "Esperanza"*

69.     Esperanza fled Guatemala with her seven-year-old son because her husband, an initiate of MS-13, "gifted" her to a gang leader to be a sex slave. She has been systematically raped in front of her three children, physically and emotionally abused, has received death threats and threats to her children's lives, and has been prevented from practicing her religion. She risks being killed if she is retuned to Guatemala. When Esperanza arrived in the United States in May 2018, Defendants immediately took her then six-year-old son away from her.

70.     At the time of her credible fear interview, Esperanza had no information about her son's whereabouts, other than having been told that he "belonged to the government now." As a result, she could not fully present the basis for her fear of persecution. She felt an overwhelming sense of fear and dread, and her primary focus during the interview was recurring thoughts of terror that she would lose her son. Because of her inability to communicate the basis of her fear during her interview, she received a negative credible fear finding, which was affirmed by an immigration judge.

71.     Esperanza was recently reunited with her child and is currently detained at Dilley.

*Plaintiff "Fany"*

72.     Fany fled Honduras with her minor daughter due to racially-motivated death threats from her husband, who would savagely beat and threaten to rape their daughter, and due to gang violence targeting her and her family members. Upon arrival in the United States in May 2018, Fany was separated from her daughter.

73.     At the time of her credible fear interview, Fany had been separated from her child for weeks. She was distressed and had great difficulty responding to questions during the interview.

She was unfocused, confused, and flustered, and her thoughts kept turning towards her missing daughter. She also was in medical distress due to injuries caused by rape. The interpreter kept interrupting her and telling her to pause, and she would forget what she was trying to say or what the question was about. She could only think about her daughter and could not focus on herself or what she had endured in Honduras. As a result of her disability, she provided erroneous and extremely truncated answers in the interview. She received a negative credible fear determination, which was affirmed by an immigration judge.

74.     Fany was recently reunited with her child, and is currently detained at Dilley.

***Plaintiff "Gina"***

75.     Gina fled El Salvador with her ten-year-old son to escape death threats and extortion from MS-13, which was trying to drug and recruit her son, and to escape attacks and death threats from her former partner, an MS-13 associate who prevented her from practicing her faith. She knows she will be killed if she returns to El Salvador. She was separated from her son about a day after arriving in the United States in May 2018.

76.     The last time she saw her son, he was standing in what she thought looked like a dog cage. He was crying out for her and was suffering from untreated and persistent nosebleeds. The guard would not let her comfort him or talk to him, and she was whisked away to another facility.

77.     Before her credible fear interview, an immigration official told Gina that if she continued to pursue her asylum claim, she would not see her son again. She also saw on television that if children were not claimed after a certain time, they can be put up for adoption.

78.     At the time of her credible fear interview, Gina had had no contact with her son for twenty-one days and did not know where he was located. She was experiencing extreme

depression, stress, and anxiety. All she wanted to do was sleep so that she would not have to think about her son and suffer the intense pain that came with those thoughts. She had stopped eating, and was completely consumed by worry. Her trauma at being separated from her son was so great that she could not concentrate on her interview and failed, due to this disability, to articulate the dire situation she faced if she were forced to return to El Salvador.

79.     Though the asylum officer asked if she wanted more information about her child's location, the officer did not provide any information or address Gina's worry. Gina felt she could not trust the officer and she considered simply asking to be deported, so she could be reunited with her son and look after his health and safety again. She received a negative credible fear determination, which was affirmed by an immigration judge.

80.     Gina was recently reunited with her son and is currently detained at Dilley.


*Plaintiff "Helena"*

81.     Helena fled Honduras with her sixteen-year-old son due to death threats she received on account of multiple protected grounds. She would suffer serious harm if she was returned to Honduras; she fears she would be murdered like her family members and that the police will not protect her. When she arrived in the United States in June 2018, immigration authorities immediately separated her from her son.

82.     She did not sleep the entire night, and worried her son had been left in the "freezer" where they had been separated. A few days before her interview, a man in the cell just next to her who had been separated from his daughter hung himself. Other mothers in Helena's cell were saying the government would send children far away and they would never see them again, and she even heard rumors that children would be sold for organ donations.

83.     At the time of her credible fear interview, just fourteen days after the separation, Helena

had not spoken with her son at all and had no idea where he was located. She had trouble

concentrating, communicating, and thinking clearly, as she could only think about the location

and well-being of her son. The interview seemed to Helena to last just minutes, though the

officer recorded a duration of more than an hour. She was not in her right mind. After the

interview she kept thinking of her son, and would wake up at night and cry. She received a

negative credible fear determination, which was affirmed by an immigration judge.

84.     Helena was recently reunited with her son and is currently detained at Dilley.

*Plaintiff "Isidra"*

85.     Isidra fled Honduras with her fourteen-year-old daughter to escape her partner, who

falsely imprisoned them, threatened to kill them, and battered them on the basis of Isidra's

political views and Christian faith. Based on the past failures of police to protect her, Isidra is

afraid of returning to Honduras. A day after she arrived in the United States, CBP officials

separated Isidra from her daughter. Isidra fell into a depression. She lost her appetite and cried

constantly.

86.     Isidra's credible fear interview took place while she was still separated from her

daughter. During her credible fear interview, she could not explain the circumstances under

which she fled Honduras because she was completely overcome with concern for the safety and

wellbeing of her daughter. For example, when asked if she was afraid to go back to Honduras or

would prefer to return there, she only stated that she wanted to be with her daughter and for her

daughter to have a better life. She received a negative credible fear determination, which was

affirmed by an immigration judge.

87.     She was recently reunited with her daughter and is currently detained at Dilley.

### Plaintiff "Jenifer"

88.     Jenifer fled Honduras with her 10-year-old son and 7-year-old daughter after having

suffered persecution on account of multiple protected grounds. Shortly after arriving in the

United States in May 2018, Jenifer was forcibly separated from her children and detained by

CBP. She was initially taken to the Pearsall Detention Center, where the guards forced her to

strip naked and threatened to cut off all of her hair.

89.     Jenifer experienced extreme mental and emotional distress as a result of being separated

from her children. She was particularly afraid for her seven-year old daughter, who had

previously been molested in Honduras, given Jenifer's own experience of humiliation at the

hands of the guards at the Pearsall Detention Center. She was terrified that her daughter would

again be molested and knew that her daughter was not comfortable being alone with strangers

after what had happened to her in Honduras.

90.     At the time of her credible fear interview, Jenifer had not been told where her children

were and was not sure if she was ever going to see them again. She was panicked and

traumatized during the interview and could not stop worrying about her children, making it

impossible to prepare for the interview or remember everything she needed to convey to the

asylum officer. As a result, Jenifer was unable to communicate or to provide meaningful answers

during her credible fear interview. She received a negative credible fear determination, which

was affirmed by an immigration judge.

91.     Jenifer has recently been reunified with her children and is currently detained at Dilley.

### Plaintiff "Kara"

92.     Kara fled Honduras with her thirteen-year-old daughter due to persecution on account of

her political opinion. When she arrived in the United States in May 2018, her daughter was taken

from her. It was the first time in their lives that they had been separated. Kara continually asked officers for any piece of information regarding her daughter, where she was, how she was doing, and when would she be able to see her. The officers would answer that it was not their problem and that they did not care.

93.    Kara was terrified for her daughter after being separated from her. She became so distraught that she had to be given medication—antidepressants and sleeping pills—to treat the depression she suffered as a result of having been separated from her daughter. The medication did not work and actually made her feel worse. Kara suffered side effects from the medications.

94.    At the time of her credible fear interview, Kara did not know where her daughter was being held and kept asking for her daughter during the interview. She was depressed, and the medication made her dizzy and confused, so she could not understand the questions. She later stated that she did not remember anything she was asked nor the responses she gave. She received a negative credible fear determination, which was affirmed by an immigration judge.

95.    Kara was recently reunited with her daughter and is currently detained at Dilley.

*Plaintiff "Linda"*

96.    Linda fled Honduras with her seven-year-old son because of persecution on account of her political opinion. Shortly after they arrived in the United States in May 2018, Linda's son was taken away from her by CBP officials. They did not tell her where her son would be taken or what the conditions of his detention would be.

97.    As a result of her separation from her child, Linda suffered great fear and anxiety and was terrified to the point of becoming physically ill. During the first week of their separation, Linda barely ate, drank, or slept. She had severe headaches. During the short periods of time that she did sleep, she had nightmares involving her son. Linda asked officials about her son

repeatedly. She was told that she would not get him back and that the U.S. government was going to place him with people who could not have children. Linda was afraid that she would never see her son again. She was able to speak briefly to her son only four times over the course of two months.

98. At the time of her credible fear interview, Linda was separated from her child and was continuing to suffer severe emotional trauma as a result of that separation. She could not concentrate or focus and could not think of anything besides her son. Linda received a negative credible fear determination, which was affirmed by an immigration judge.

99. Linda was recently reunified with her son and is currently detained at Dilley.


*Plaintiff "Mindy"*

100. Mindy fled Honduras with her sixteen-year-old son because of persecution on account of her religious beliefs and other protected grounds. Mindy and her son were apprehended by CBP and initially detained together. A few days later, officials told Mindy that her son would be taken from her, but did not tell her where he would be taken, how long they would be separated, or the conditions of his detention.

101. Mindy and her son were given only a few minutes to speak before he was taken away. After her son was taken away from her, Mindy was placed in handcuffs and ankle cuffs. Officials asked her if she wanted to commit suicide. Because her blood pressure was very high, she was given medication of an unknown type. For four days, she was kept in the "*hielera*" (ice box), a freezing holding facility CBP uses at the border.

102.    Mindy suffered tremendous fear and anxiety because of her separation from her son.  She did not know whether she would ever see her son again, and officials would not inform her about his whereabouts or his condition. At the time of her credible fear interview, she was separated from her son and did not know whether or when they would be reunited. She was so distracted and distraught about being separated from her son that she could not think straight or focus on the questions she was being asked. She received a negative credible fear determination, which was affirmed by an immigration judge.

103.    Mindy was recently reunited with her son and is currently detained at Dilley.

*Plaintiff "Nora"*

104.    Nora fled El Salvador with her six-year-old daughter because of persecution on account of a protected ground. When she arrived in the United States in May 2018, she and her daughter were apprehended by CBP officials and were initially detained together in the *hielera*. Shortly thereafter, Nora and her daughter were forcibly separated. Her daughter cried and begged to stay with Nora, who could do nothing as the CBP officials put her in handcuffs and took her daughter away.

105.    Nora was inconsolable upon being separated from her daughter, who had already suffered trauma in El Salvador after her father's murder at the hands of MS-13. While in detention, Nora repeatedly asked officers about her daughter and begged for a chance to speak with her. The officers told her that no one knew where her daughter was taken, leaving Nora so hopeless and depressed that she considered suicide. She replayed in her head, over and over again, the moment she and her daughter were separated.

106.    At the time of her credible fear interview, Nora was living in tremendous fear, anxiety, and uncertainty. She was not sure if her daughter was safe, or if she would ever see her again.

Her exhaustion and trauma at being separated from her daughter prevented her from fully articulating the basis of her claim for asylum.

107.    Nora was recently reunified with her daughter and is currently detained at Dilley.

*Plaintiff "Orelia"*

108.    Orelia fled Honduras with her thirteen-year-old son because of persecution on account of multiple protected grounds. She was separated from her son shortly after her arrival in the United States in May 2018. She was extremely anxious and worried about her son, and was only able to speak with him briefly on two occasions.

109.    Immediately before her credible fear interview, which took place while she was separated from her son, an officer told Orelia that her son was placed with another family, which Orelia thought meant that he had been adopted. This exacerbated her already severe anxiety and trauma. From that point on, Orelia found it difficult to function and was barely able to sleep or eat.

110.    During the interview, Orelia became extremely nervous. She was not able to present her claim due to the trauma of being separated from her child and the overwhelming fear she felt not knowing if her child was safe or if she would ever see him again. She was unable to concentrate and therefore could not discuss important aspects of her claim. She could only think about her child and was constantly distracted, not knowing if he was alive or dead. Her interview clearly demonstrates that her thoughts were only with her child. Throughout the interview, she spoke about her son's safety and asked about his current status instead of focusing on her own asylum claim. She received a negative credible fear determination, which was upheld by an immigration judge.

111.    Orelia and her son were recently reunited, and she is currently detained at Dilley.

*Plaintiff "Patricia"*

112.    Patricia fled El Salvador with her fourteen-year-old son because of persecution on account of her political opinion, sexual orientation, and membership in a protected social group. She was separated from her son shortly after arriving in the United States.

113.    For 25 days, Patricia did not know her son's whereabouts. She was so worried and scared for her son that she fell violently ill. Despite Patricia's multiple attempts to discover her son's location, she was not provided any information about him.

114.    At the time of her credible fear interview, Patricia was under extreme emotional distress due to her separation from her son and her fear that she would never see him again. She was physically ill, so she was unable to prepare for the interview and unable to focus on the questions during the interview. As a result, she misunderstood questions and was unable to fully explain her case. She received a negative credible fear determination, which an immigration judge affirmed.

115.    Patricia was recently reunited with her son and is currently detained at Dilley.

*Plaintiff "Quela"*

116.    Quela fled Guatemala with her seventeen-year-old son because of persecution on account of her membership in multiple protected groups. Shortly after her arrival in the United States, she was separated from her son without explanation.

117.    While detained, guards treated Quela badly, insulted her, and repeatedly told her she would never see her son again because they were going to use him "for a war [they] were fighting." Quela was not told where her son was or if she would ever see him again. She was constantly depressed and crying during the long period of separation from her son.

118.    At the time of her CFI, Quela was extremely distressed. She could not focus on the questions being asked of her, and she was visibly upset and crying for the duration of the

interview. She was singularly focused on the hope of reuniting with her son and believed that the faster she could complete the interviews and other procedures, the sooner she might be reunited with him. She received a negative credible fear determination, which was affirmed by an immigration judge.

119.   Quela was recently reunified with her son and is currently detained at Dilley.

*Plaintiff "Rita"*

120.   Rita fled Guatemala with her thirteen-year-old son to escape persecution on the basis of her race, membership in a particular social group, and political opinion. She fears return to Guatemala because she and her entire home town have been singled out and attacked by the government for their activism and political protest and for other reasons. When she arrived in the United States in May 2018, officers immediately separated her from her son.

121.   When Rita realized her son was missing, she couldn't stop crying. She had never been separated from him before. Officers said they did not know where her son had been taken, and that it was not their problem and they did not care. After fifteen days, she was finally able to speak with him for very short periods of time on the phone. She was in such anguish that she stopped eating, suffered from headaches, and suffered from crippling feelings of guilt that she could not ensure her son's safety.

122.   At the time of Rita's CFI, she was in extreme anguish and felt as though she was losing her mind. She just wanted to have her son by her side again. She could not understand the questions and could not focus on the interview. This was compounded by the fact that the interpreter did not speak the same indigenous dialect as hers. She received a negative credible fear determination, which was upheld by an immigration judge.

123.   Rita was recently reunited with her child and is currently detained at Dilley.

*Plaintiff "Sylvia"*

124.     Sylvia fled Guatemala with her nine-year-old daughter because of persecution on account

of multiple protected grounds. The day after she arrived in the United States, officers separated

her from her daughter. Because Sylvia's daughter had been assaulted when she was six, Sylvia

feared it could happen again if they were separated. Sylvia suffered from nightmares where she

vividly saw her daughter being assaulted, and she would wake up screaming and crying.

125.     At the time of her CFI, Sylvia had been separated from her daughter for eighteen days.

Sylvia's fear and anxiety about her daughter were crippling, and it was impossible for her to

focus on and articulate critical aspects of her claims during the interview. She received a

negative credible fear determination, which was affirmed by an immigration judge.

126.     Sylvia was recently reunited with her daughter and is currently detained at Dilley.

*Plaintiff "Tania"*

127.     Tania fled Guatemala with her six-year-old son because of severe persecution on account

of multiple protected grounds. She is terrified that she will be forcibly returned to Guatemala.

Shortly after her arrival in the United States in May, 2018, officers separated her from her son.

She worried about her son constantly, and the separation heightened and compounded the trauma

she was already experiencing from her persecution in Guatemala.

128.     At the time of her CFI, Tania was extremely distressed, scared, and confused because of

her separation from her child. As a result, she was unable to provide a narrative of her trauma

and persecution in Guatemala. The asylum officer used a fast pace and either failed to recognize

or ignored her emotional exhaustion, for example by failing to follow up when Tania was non-

responsive. She clearly had trouble understanding the interview questions.

129.    Towards the end of the interview, Tania began pleading for information about her son, asking where she could call her son, and stating she was not sure if he was doing well and that she was sure he was crying for her. The asylum officer dismissed these questions, stating "I do not work here and am not involved in that." She received a negative credible fear determination, which was affirmed by an immigration judge.

130.    Tania was recently reunited with her son and is currently detained at Dilley.

*Plaintiff "Ula"*

131.    Ula fled Honduras with her eight-year-old daughter to escape past persecution, including death threats, attempted murder, and the actual murder of her mother in front of her eyes, persecution to which she was subjected on the basis of multiple protected grounds. When she first arrived in the United States with her daughter, they were placed in the *hielera* together. Shortly thereafter, an officer came in and said he was going to take her daughter to another room until the next morning. The next morning, she began asking multiple officials about her daughter, but no one would give her any information about her whereabouts. She became extremely anxious and upset. She could not sleep, and she cried every day. She could barely eat. She kept asking officer after officer about her daughter, but nobody would give her any information.

132.    At the time of her credible fear interview, Ula was separated from her daughter and was extremely anxious and traumatized by that separation. The asylum officer asked her questions about her child at the beginning of the interview, which caused Ula to be unable to think about anything else over the course of the entire interview. She received a negative credible fear determination, which was upheld by the immigration judge.

133.    Ula was recently reunited with her daughter and is currently detained at Dilley.

*Plaintiff "Victoria"*

134.    Victoria fled Guatemala with her eight-year-old son to escape rape and incest, as well as persecution on the basis of her religious beliefs. She is terrified at the idea of being returned to Guatemala. When she was twelve years old, she was raped repeatedly by her uncle and gave birth to a daughter. While she was recovering from the birth, her daughter was forcibly taken away from her and given to another family without her consent. She spent years trying to locate her daughter, and when she eventually found her, was barely allowed to see her by her adoptive mother. She has suffered repeated and multiple forms of persecution on the basis of her status as a rape and incest victim and other protected grounds.

135.    In light of her history, Victoria was especially and distinctly traumatized when, within days of arriving in the United States in June 2018, her son was forcibly taken away from her. The guards told her she would not see her son again, and that this was why she should not have crossed the border.

136.    As a result of her separation from her son, she experienced sleeplessness, nightmares when she did sleep, memory deficiencies, inability to concentrate, and other symptoms of acute trauma. She was diagnosed with PTSD on August 7, 2018 by a clinical psychologist, who found that the second instance of child disappearance build upon and heightened the trauma she had previously experienced with the first separation.

137.    At the time of her CFI, she was separated from her son and completely incapable of testifying on her own behalf. She had no understanding of the process and could not focus on the questions she was being asked or bring to mind the answers to those questions. She received a negative credible fear determination, which was upheld by an immigration judge.

138.    Victoria was recently reunified with her son and is detained at Dilley.

*Plaintiff "Wilma"*

139.    Wilma fled Honduras with her ten-year-old son to escape sexual violence and assault and death threats on account of a protected ground. When Wilma arrived in the United States in June 2018, she successfully sought out CBP officials, believing they would assist her and her son because they were seeking asylum.

140.    She held her son's hand the entire time they were transported to the *hielera* because she did not want to lose him. Eventually they were moved to a facility with cells separated by chain-linked fencing that resembled cages. The women were made to stand on one side and children on the other, but it was too far to see if her son was on the other side. At some point in the next day, CBP officials had the mothers line up and had the children walk past in a line and identify their mothers. After spending ten minutes with her son, they were separated again. Not all the children could find their mothers. Wilma was then taken to criminal court for prosecution for illegal entry, and when she returned, the children were gone. The initial separation, brief reunion, and re-separation, along with her complete lack of information about her child's whereabouts made her desperate. She feared her son would be returned to Honduras without her. And even when she spoke with her son on the phone ten days later, she felt worse, because her son didn't know where he was, and he was crying for the entire duration of the phone call.

141.    At the time of Wilma's credible fear interview, she was separated from her son and did not know if she would see him again. As the interview progressed from biographical and straight-forward questions to more complex questions about the reasons for her flight from Honduras, Wilma felt more and more worried about the fate and whereabouts of her son. She felt she was in a fog and could not think or answer clearly. She wanted the interview to end so she

could see her son again, and at the conclusion of the interview asked if the asylum officer could tell her the location of her son. Wilma received a negative credible fear determination.

142.    Wilma was recently reunified with her child and is currently detained at Dilley.

***Plaintiff "Xiomara"***

143.    Xiomara fled Honduras with her two daughters, aged fourteen and six, because of multiple forms of persecution on account of protected grounds, including death threats against her and her daughter for not paying money to the gangs. She fears this persecution will continue if she is forced to return to Honduras, and that the authorities cannot or will not protect her. When she arrived in the United States in May 2018, she spent a night in the *hielera* with her two daughters. The next day, CBP officials took her daughters away with no notice.

144.    In the following days and weeks, Xiomara could not function mentally or emotionally, felt extreme sadness and anxiety, could not sleep properly, and felt pains in her chest. When Xiomara was at the Port Isabel Detention Center, facility staff yelled at her and at the other women that they would be deported soon and would not see their children.

145.    Xiomara was especially susceptible to manipulation of her relationship with her children, because this was a pattern used by gang members in Honduras. For example, after Xiomara's daughter got out of school one day, a gang member pointed a gun at the girl's head and told her that if she did not pay the gang a "business tax," the girl would become a gang member as payment. Once Xiomara had her children grabbed from her in detention, she thought about them constantly, and submitted multiple paper requests every week asking for information about their whereabouts and circumstances.

146.    At the time of Xiomara's credible fear interview, she could not discuss crucial aspects of her claim because of her singular focus on being reunited with her daughter and son. The asylum

officer was brusque and would not allow her to finish her statements or to elaborate. Under the extreme distress of separation from her children, Xiomara could not collect herself to focus on the questions fully. She received a negative credible fear determination, which was upheld by an immigration judge.

147.    Xiomara was recently reunited with her children and is currently detained at Dilley.

*Plaintiff "Yadira"*

148.    Yadira left Guatemala with her nine-year-old son to escape threats from the Mendoza drug cartel after her boyfriend and uncle were murdered. She fears the cartel will kill her and her son if they return, because she disobeyed their orders and because the cartel members visited her home multiple times to ask for them. Shortly after arriving in the United States in May 2018, she was forcibly separated from her son.

149.    At the time of Yadira's credible fear interview, she did not know where her son was, and whether he was safe. She was under extreme pressure and stress, and believed she might never see him again. As a result, she could not share her full story, and she had trouble thinking clearly. She received a negative credible fear determination, which was upheld by the immigration judge.

150.    She was recently reunited with her son and is currently detained at Dilley.

*Plaintiff "Zandra"*

151.    Zandra left Honduras with her ten-year-old daughter to flee persecution on account of multiple protected grounds. A few days after arriving in the United States in June 2018, CBP officers took away her then nine-year-old daughter, stating that she would see her again in a few days. Each day they told her she would see her daughter soon, creating a torturous cycle of belief that reunification was near, only to have that dream shattered. Zandra could not and still cannot

sleep. She had constant headaches and found herself sobbing at random moments. She felt like she was in a horrible movie.

152.    At her credible fear interview, Zandra spoke with a hostile asylum officer who told her not to talk and to answer questions with "yes" or "no," or in short sentences. She was extremely disoriented and scared that she would be deported without her daughter and that they would never meet again. Zandra received a negative credible fear determination, which was affirmed by an immigration judge.

153.    Zandra has recently been reunited with her daughter and is currently detained at Dilley.

*Plaintiff "Alex"*

154.    Alex left Honduras with his six-year-old son fleeing threats of gang violence and persecution. One day after arriving in the United States in May 2018, he was separated from his son. Alex was crushed by thoughts of self-reproach, believing that he had failed to protect his son. He found himself sobbing at night, lost his appetite, and experienced painful stomach aches. He felt emotionally consumed and physically exhausted. He felt like he was going to die.

155.    At the time of his credible fear interview, Alex was in physical pain because of the trauma of being separated from his son. He did not understand many of the questions asked, could not concentrate, could not share his story, and could only think about his son and whether they would ever see each other again. He received a negative credible fear determination, which was upheld by an immigration judge.

156.    Alex was recently reunited with his son and is currently detained at Karnes.

*Plaintiff "Benjamin"*

157.    Benjamin left Guatemala with his fourteen-year-old son because of gang violence and threats targeted at him and his family. He suffers from insomnia and fears being killed, robbed,

and threatened if he is returned to Guatemala. About two days after arriving in the United States, CBP officials separated him from his son.

158.    At the time of his credible fear interview, Benjamin felt extremely worried and distressed about his son. He had not been eating or sleeping, was suffering from a physical injury, and was having a hard time communicating or articulating the basis for his fear of return. He received a negative credible fear determination, which was upheld by an immigration judge.

159.    Benjamin was recently reunited with his son and is currently detained at Karnes.

**Plaintiff "Carlos"**

160.    Carlos fled Honduras with his eight-year-old son to escape violence and death threats from gang members who murdered his friend in front of him then shot at and nearly killed him, as well as from police persecution on the basis of multiple protected grounds. When he arrived in the United States, Carlos sought out Border Patrol in order to seek asylum. Carlos and his son were placed in the *hielera*. Shortly thereafter, an officer called his son's name. Carlos asked where they were taking him and the officer said she did not know. Carlos could not get any information about his son. A day later, he was transferred to another detention center. He was extremely nervous and upset by his separation from his son, and had difficulty eating or sleeping.

161.    At the time of his CFI, Carlos had been separated from his son for over a month. The guard that took him to his CFI observed that Carlos was not doing well, and Carlos told the guard he felt like a crazy person. He was pale, and visibly distressed. He had been thinking about his son constantly, and he continued to think obsessively about his son during the interview. The asylum officer seemed intimidating and hostile, and forced Carlos to just answer "yes" or "no." Carlos received a negative credible fear determination. Immigration officials told him that he would be reunited with his son more quickly if he did not go to an immigration judge for review

of his case. Because he was desperate to be together with his son at any cost, he did not appeal

his case, despite the fact that, if returned to Honduras, he fears severe persecution and possibly

death on account of a protected ground.

162.    Carlos was recently reunited with his son and is currently detained at Karnes.

*        *        *

163.    In sum, each of the Plaintiffs experienced severe trauma and other psychological

conditions because of Defendants' policy of forcibly separating them from their children,

continuing to process them for removal while they were traumatized by that separation, and

forcing them to undergo credible fear interviews while they were too traumatized to competently

testify on their own behalf.

## II.    The Trauma Experienced By Parents Separated From Their Children Was Predictable, Is Well-Documented, and Impacted Their Ability to Meaningfully Participate in Credible Fear Interviews.

164.    It is widely known that asylum seekers at the border already experience a high prevalence

of trauma and psychological distress due to factors such as pre-migration exposure to violence,

torture, and life-threatening travel conditions.[1] A study focusing on Central American Migrants

---

[1] *See generally* Giulia Turrini et al., *Common Mental Disorders in Asylum Seekers and Refugees: Umbrella Review of Prevalence and Intervention Studies*, 11 Int'l J. Ment. Health Syst. (2017) (winnowing a total of 535 studies to 27 relevant systematic reviews, 13 of which reported data on the prevalence of trauma-related symptoms or conditions like PTSD, depression, and anxiety); K. Robjant, R. Hassan & C. Katona, *Mental Health Implications of Detaining Asylum Seekers: Systematic Review*, 194 Br. J. Psychiatry 306-312 (2009) (compiling data across 10 studies and 877 detained asylum seekers to find high levels of mental health problems such as anxiety at 77%, depression at 59%-100%, and PTSD at 27%-50%); I. Bronstein & P. Montgomery, *Psychological Distress in Refugee Children: A Systematic Review*, 14 Clin. Child Fam. Psychol. Rev. 44–56 (2011) (compiled data from 22 studies covering 3003 refugee children and adolescents under the age of 25 resettled in Western countries and found a PTSD range of 19 to 54 percent and a depression range of 3 to 30 percent).

arriving at the U.S. border, for example, found that of 234 adults interviewed, 32 percent of the sample group met diagnostic criteria for PTSD, 24 percent for depression, and 17 percent for both disorders. Allen Keller et al., *Pre-Migration Trauma Exposure and Mental Health Functioning Among Central American Migrants Arriving at the U.S. Border*, 12 PLoS ONE (Jan 10, 2017).

165.   As asylum seekers, the parents in the instant case unsurprisingly "arrived in the United States already worn down." Cohen Decl. at 2. "All had endured a protracted period of fear and violence in their own countries before making the difficult decision to leave . . . Many had endured tremendous physical hardship or violence before leaving and arrived physically weakened by a long journey." *Id.*

166.   Against the backdrop of this baseline trauma, family separation predictably caused these parents severe emotional distress, including symptoms that rose to the level of cognitive disability. *See Ms. L. v. U.S Immigration & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1146 (S.D. Cal. 2018) (noting that the trauma parents have suffered as a result of the family separation policy "deserves special mention" and "constitutes irreparable harm").

167.   As Dr. Cohen details, the representative sample of parents she interviewed described "severe symptoms arising from all four categories of traumatic response" and accordingly qualified for a diagnosis of Acute Stress Response. Cohen Decl. at 2. The four categories were: intrusion symptoms (involuntary distressing memories of the separation, sleep disturbance and nightmares, or obsessional reliving of the loss of the child); avoidance symptoms (avoiding reminders of the distressing subject matter); negative alterations in cognition and mood (persistent experience of profound suffering and misery and inability to distract oneself from anxiety and depression); and marked alterations in arousal and reactivity (persistent experience

of fear or anxiety and exaggerated startle response, difficulty sitting still). *Id.* at 2-3. Physical

symptoms included sleep disturbance, loss of appetite, palpitations and headaches, weight loss,

lightheadedness, and gastrointestinal symptoms such as abdominal pain and nausea. *Id.*

168.    Parents' own distress at being separated from their children was exacerbated by their

perception of the distress their children were experiencing as well. *See Diagnostic and Stat.*

*Manual, 5th Ed.* at 271 (defining trauma to include vicarious exposure such as "witnessing, in

person, the traumatic event(s) as it occurred to others [or] learning that the traumatic event(s)

occurred to a *close family member*.") and Fact Sheet: The Trauma of Childhood Separation,

History of Psychiatry, Weill Cornell Medicine (July 2, 2018) (describing impact on children of

trauma due to separation from their parents). As Dr. Cohen describes, each of the parents in the

representative sample she interviewed experienced symptoms such as visualization of the

torment and suffering of their lost child: "I see my child and she is calling for me but I'm tied up

in chains and can't get to her. I scream for someone to help but nobody comes." Cohen Decl. at

2.

169.    Several Plaintiffs reported that during the single short phone call they had with their

child, their child wept the entire time, was extremely distressed, or related highly disturbing

stories about being threatened or told they would be beaten if they cried. Others had had no

contact with their children and were intensely anxious and worried about their whereabouts and

well-being. All experienced extreme distress at the thought that their children were distressed or

not doing well.

170.    As a result of this distress, the representative sample of separated parents Dr. Cohen

interviewed "all described an inability to think clearly: to process information, to organize

information, to retrieve memories in full . . . None were able to describe priorities beyond that of

getting their children back and none were able to think in broader, abstract strategic terms."
Cohen Decl. at 3. By reason of their acute trauma, the parents could not perform basic functions
essential to communicating the grounds for their asylum claims.[2]

171.    Parents in this situation were likely also experiencing a range of other symptoms that
made it impossible for them to clearly recall and coherently articulate the reasons for their fear of
return to their home countries. *See, e.g.*, Expert Statement on the Impact of Parent-Child
Separation on Parents' Ability to Effectively Participate in Asylum Proceedings, attached hereto
as "Exhibit B."

172.    A typical example of this can be found in a recording of an immigration judge review of
a denied credible fear interview, conducted at the immigration court located in the Port Isabel
Detention Center.  *See* https://soundcloud.com/user-488995707/ij-hearing-1 (last visited August
17, 2018).  The Respondent, a mother who had been subjected to the government's policy of
forcible family separation, opens the hearing by audibly sobbing and saying, "I cannot go
forward, I don't feel well.  I cannot stand the feeling in my head."  In response, the immigration
judge offers to push her case to the back of that day's calendar, to "give you time to compose
yourself." "What do you want to do?," asks the immigration judge, to which the distraught
mother answers, "What I want is to be with my son."  The immigration judge responds, "I
understand that.  Is there anything you want to say regarding your case?" The mother answers, "I
cannot continue with this anymore.  What I want is to be with my son."

---

[2] The distress parents were experiencing and their inability to participate in interviews and
hearings is illustrated in audio recordings released by news outlets of parents describing feeling
ill and unable to participate in their proceedings. *See, e.g., Hear: Immigrant Moms Plead with
Judge for Kids,* CNN, at 2:38 (Jul. 24, 2018), https://www.cnn.com/videos/us/2018/07/24/
detention-center-audio-mothers-separated-orig-al.cnn/video/playlists/family-separations.

173.   Faced with a person who was obviously and apparently suffering disabling trauma, instead of offering any accommodations whatsoever, the immigration judge simply says "Okay," and then launches immediately into the merits of the case: "Ma'am, you told the asylum officer that you fear returning to your country because you were raped by your uncle in the year 2000, that's when you were twelve years old, and you said you became pregnant by him?  Is that your child?"

174.   Unlike most parents facing credible fear reviews, this mother was represented by counsel, and her attorney then sought to vacate the proceedings "due to mental instability."  The immigration judge simply responded, "You need to take those up with the Department of Homeland Security."  The hearing concluded without the mother able to say one word in support of the substantive merits of her asylum claim, and—not surprisingly—the denial of credible fear was upheld, and the mother was ordered removed from the United States.  As the mother left the courtroom, the immigration judge directed court staff to take her straight to the medical unit. The entire hearing lasted five minutes.

175.   None of the parents received any accommodation for their impairment during their credible fear interview or at their immigration judge reviews. As a result, each of them received a negative credible fear determination despite compelling claims for asylum relief.

### III.   The Government Implemented a Family Separation Policy That Traumatized Parents, and Continued to Process Parents For Removal Before They Were Reunited With Their Children.

176.   As set forth below, pursuant to the "zero tolerance" policy, the family reunification executive order as explained in a DHS fact sheet published on June 23, 2018, and further written policies implementing the zero tolerance policy and the executive order, Defendants have put in place a policy of:

- continuing to process parents quickly for removal and to reunify them with their children only "for the purpose of removal" after they had already received a deportation order;

- pushing traumatized parents through credible fear interviews before they were reunified with their children, while they were not competent to participate in such interviews, and without any accommodations for the trauma and other psychological conditions their separation from their children caused them, in order to achieve the end of speedy removal; and

- relying on those defective credible fear interviews to issue expedited orders of removal, thereby depriving Plaintiffs of a meaningful opportunity to apply for the protection of asylum. *See, e.g.,* Fact Sheet: Zero-Tolerance Prosecution and Family Reunification, attached hereto as "Exhibit C."

A. **The Zero Tolerance Policy**

177.    On April 6, 2018, Attorney General Jeff Sessions announced a "zero tolerance policy" for persons seeking asylum who cross the border at points other than a legal port of entry, stating that they would "be met with the full prosecutorial powers of the Department of Justice."[3]

178.    On May 7, 2018, he further stated with respect to individuals crossing the border with a child that "we will prosecute you. And [your] child may be separated from you."[4]

---

[3] Press Release, U.S. Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[4] Brett Samuels, *Sessions unveils 'zero tolerance' policy at southern border*, The Hill (May 7, 2018), http://thehill.com/homenews/administration/386634-sessions-illegal-border-crossers-will-be-prosecuted-families-may-be.

179.    This family separation policy operationalized a long-standing decision by administration officials to separate parents and children in order to deter asylum seekers from coming to the United States.[5]

180.    The government began to apply its "zero-tolerance policy" against parents who crossed the border with their own children seeking asylum. Prosecution under the new policy resulted in systematic forcible separation of parents from their children. The parents were prosecuted criminally for unlawful entry, and their children were taken away from them, deemed "unaccompanied," and moved to locations that were not disclosed to the parents.[6]

181.    Children forcibly separated from their parents were transferred to the custody of the Office of Refugee Resettlement, a component of the Department of Health and Human Services. *Id.* For weeks or months after separation, most parents had no knowledge of the whereabouts or conditions of their children. As previously described, many parents had only a single short phone call with their child, during which the child wept inconsolably or expressed extreme distress. Others had no contact with their children. Most did not know the whereabouts of their children, even after they had a brief phone call with them.

B. **The Family Reunification Executive Order and Written Implementing Policies To Reunify Parents With Children Only "For the Purpose of Removal"**

---

[5] *See* John Haltiwanger, *John Kelly proposed separating children from their parents to deter illegal immigration last year, and now the Trump administration can't get its story straight*, Business Insider (June 18, 2018), https://www.businessinsider.com/kelly-proposed-family-separation-to-deter-illegal-immigration-in-2017-2018-6; Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, New Yorker (May 30, 2018), https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.
[6] Sarah Almukhtar, Troy Griggs and Karen Yourish, *How Trump's Policy Change Separated Migrant Children From Their Parents*, N.Y. Times (June 20, 2018), https://www.nytimes.com/interactive/2018/06/20/us/border-children-separation.html.

182.    In the face of widespread public condemnation, President Trump purportedly retracted the family separation policy by Executive Order (hereinafter "EO") on June 20, 2018.[7]

183.    The EO, however, did not include any provisions to reunite families that had been separated prior to June 20. Federal officials stated that those children would not be reunited with their families while the adults remain in federal custody during their immigration proceedings. A government spokesperson stated that there would "not be a grandfathering of existing cases."[8]

184.    Instead, written policies implementing the EO made clear that the purpose was to continue processing parents for removal and to reunify them with their children only at the point where they were preparing to remove them from the United States.

185.    On June 23, 2018, DHS released a Fact Sheet about the EO stating explicitly that the family reunification process will reunify children with parents "for the purposes of removal."[9] The fact sheet specifies that "[o]nce the parent's immigration case has been adjudicated . . ., ICE will seek to reunite verified family units and link their removal proceedings so that family units can be returned to their home countries together."[10] The fact sheet makes no provision for reunifying children before the conclusion of their parents' immigration proceedings or for

---

[7] Exec. Order No. 13841, Affording Congress an Opportunity to Address Family Separation, 83 FR 29435 (June 20, 2018), https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/?utm_source=twitter&utm_medium=social&utm_campaign=wh; *see also* Michael Shear, Abby Goodnough and Maggie Haberman, *Trump Retreats on Separating Families, but Thousands May Remain Apart*, N.Y. Times (June 20, 2018), https://www.nytimes.com/2018/06/20/us/politics/trump-immigration-children-executive-order.html, attached hereto as "Exhibit D."

[8] Shear, Goodnough and Haberman, *Trump Retreats, supra* note 7.

[9] Fact Sheet: Zero-Tolerance Prosecution and Family Reunification ("Zero Tolerance Fact Sheet"), Dep't of Homeland Sec. (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification; *see also* Gus Bova, *Trump Administration Sets Up Potential Deportation Factory for Reunified Families in South Texas*, Tex. Observer (July 27, 2018), https://www.texasobserver.org/trump-administration-sets-up-potential-deportation-factory-for-reunified-families-in-south-texas/.

[10] Zero Tolerance Fact Sheet, *supra* note 9.

discontinuing the unlawful policy of forcing separated parents to undergo credible fear interviews without appropriate safeguards or accommodations.

186.    The fact sheet reflects a clear policy of continuing to process parents quickly for removal and to reunify them with their children only "for the purpose of removal" after they had already received a deportation order, pushing them through their credible fear interviews quickly and without accommodations for their trauma in order to achieve that end.

187.    In court proceedings, Justice Department attorney Sarah Fabian confirmed that there was no procedure or mechanism in place for parents awaiting credible fear determinations to reunite with their separated children.[11]

188.    Instead, on information and belief, further written policies and guidelines directed that parents should continue to be processed for removal before reunification, including forcing parents to undergo credible fear interviews without safeguards or reasonable accommodations for the trauma caused by separation from their children.

## C.    Effects of the Zero Tolerance Policy, the Family Reunification EO and Fact Sheet, and Subsequent Implementing Policies Continuing CFIs For Traumatized Parents

189.    During the time between the implementation of the "zero-tolerance policy" and the issuance of the EO, more than 2,300 children were separated from their families.[12]

190.    Most parents had no knowledge of their children's whereabouts and frequently had little or no contact with their children for the entire period of separation.

---

[11] Tal Kopan, *Government never had specific plan to reunify families, court testimony shows*, CNN (June 29, 2018), https://www.cnn.com/2018/06/29/politics/family-separations-reunification-never-plan-court/index.html.

[12] *See* Tal Kopan and Veronica Stracqualursi, *Trump administration: Some children currently in Border Patrol custody will be reunited with* parents, CNN, (June 21, 2018), https://www.cnn.com/2018/06/21/politics/children-border-reunited/index.html.

191.     Even government officials had difficulty obtaining any answers from the government about the numbers and whereabouts of children who had been separated from their parents; New York Governor Andrew Cuomo, for example, reported that federal officials would not even tell him the number of children that had been sent to his state's facilities.[13]

192.     On June 26, 2018, a federal judge ordered the government to reunify all families who have been separated from their children. The judge ordered that all children under the age of 5 should be reunified with their parents by July 10, and that all other children should be reunified with their parents by July 26. *See Ms. L. v. U.S. Immigration and Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). The government did not meet the July 10 or the July 26 deadlines.[14] Court proceedings in that case remain ongoing.

193.     During the time that parents were separated from their children, countless parents underwent interviews with asylum officers in which they were, in theory, given the opportunity to explain the basis for their fear of return to their home country. Because the EO failed to provide for reunification of parents already separated from their children, the government implemented written policies to continue rushing parents through the credible fear interview process despite their ongoing separation from their children and resulting trauma. As set forth previously, the separated parents were not competent to complete such an interview at that time.

194.     The credible fear interviews to which Plaintiffs were subjected were also fatally deficient because of unlawful written policies directing asylum officers to make negative findings if the

---

[13] Margaret Hartmann, *Trump Administration Still Has No Plan for Reuniting the Families It Separated*, N.Y. Mag (June 22, 2018), http://nymag.com/daily/intelligencer/2018/06/trump-admin-has-no-plan-for-reuniting-families-it-separated.html.

[14] *See, e.g.*, Elliot Spagat and Colleen Long, *700 Kids Still Separated From Their Families After Government Misses Reunification Deadline*, TIME (July 26, 2018), http://time.com/5350788/kids-separated-from-families-july-26-deadline/.

fear is based on domestic or gang violence and to seek to deny claims, where possible, on a discretionary basis, all on the sole authority of the Attorney General's recent decision in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).[15] These policies have been detailed and challenged in *Grace v. Sessions*, 1:18-cv-01853-EGS (D.D.C. filed Aug. 7, 2018), and Plaintiffs in this action are entitled to relief from removal on this additional ground as well.

195.    Defendants have deported over 450 parents without their children since the issuance of the zero tolerance policy.[16] They have issued negative credible fear determinations to an unknown number of parents who went through their credible fear interviews without accommodations while they were traumatized by their separation from their children.

196.    Parents continued to be deported without their children after the EO, pursuant to the DHS fact sheet and other implementing policies directing that immigration agencies continue processing parents for removal before reunification.[17]

197.    But for a temporary court order blocking the government from deporting reunified parents and their children, Defendants' policy is to deport families immediately upon reunification on the basis of fundamentally flawed negative credible fear findings.[18]

---

[15] *See also*, USCIS, July 11, 2018 Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-.

[16] *See* Miriam Jordan & Caitlin Dickerson, *More Than 450 Migrant Parents May Have Been Deported Without Their Children*, N.Y. Times (July 24, 2018), https://www.nytimes.com /2018/07/24/us/migrant-parents-deported-children.html.

[17] *See, e.g.* Jordan & Dickerson, *More Than 450*, *supra* note 16; Joshua Partlow, *U.S. officials separated him from his child. Then he was deported to El Salvador*, Wash. Post (June 23, 2018), https://www.washingtonpost.com/world/the_americas/u-s-officials-separated-him-from-his-child-then-he-was-deported-to-el-salvador/2018/06/23/37b6940a-7663-11e8-bda1-18e53a448a14_story.html?utm_term=.f4398db7d308; Elisa Foley, *Trump Administration Deported 19 Parents Whose Young Kids Are Still In Custody*, HuffPost (July 6, 2018), https://www.huffingtonpost.com/entry/family-separations_us_5b3f8bc2e4b07b827cbff1e1.

[18] *See* Zero Tolerance Fact Sheet; Bova, *Trump Administration Sets Up*, *supra* note 9.

198.    Defendants' actions were undertaken pursuant to the zero tolerance policy, the EO, the

fact sheet guidelines, and, upon information and belief and based on all available evidence,

written policies and directives issued after the EO which specify that separated parents should

continue to undergo credible fear interviews and be processed for expedited removal before

reunification, in order to ensure speedy removal after reunification.

## LEGAL BACKGROUND

### I.    The Asylum Laws, Credible Fear Interviews, and Safeguards For Persons Who Are Not Competent

199.    United States law entitles non-citizens on U.S. soil to seek asylum without regard to how

or where they arrive. 8 U.S.C. § 1158(a)(1).

200.    Since 1996, immigration law has also provided for an abbreviated "expedited removal"

process, where certain individuals may be deported from the United States without a removal

hearing before an immigration judge. *Id.* § 1225(b)(1)(A)(i).

201.    Even an individual subject to expedited removal, however, must be referred to an asylum

officer for a credible fear interview if he or she indicates an intention to apply for asylum or a

fear of persecution in his or her home country. *Id.* § 1225(b)(1)(A)(ii). An asylum officer must

then conduct a screening interview to determine whether the asylum seeker has a credible fear of

persecution.

202.    If an asylum officer determines that there is a "significant possibility" that such an

individual could prove eligibility for fear-based relief, then the asylum seeker is placed into

regular removal proceedings. *Id.* §§ 1225(b)(1)(B)(ii) and (v).

203.    If, however, an individual in this posture is determined not to have a credible fear of

return, he or she may only appeal that determination in a very limited way to an immigration

judge who conducts a cursory review of the asylum officer's finding. If the judge affirms the

asylum officer's negative determination or if the individual does not appeal the asylum officer's determination, he or she is sent back to ICE or CBP for immediate removal.

204.    Thus, for persons in expedited removal proceedings, the credible fear interview is the only way to access the asylum process and to avoid removal to dangerous or life-threatening conditions.

205.    In conducting a credible fear interview, the asylum officer must take into account the person's statements as well as other facts known to the asylum officer. 8 C.F.R. § 208.30(d).

206.    In preparing for a credible fear interview, an individual may consult with any person of his or her choosing, including family members. 8 U.S.C. § 1225(b)(1)(B)(iv).

207.    It is generally within ICE and CBP's discretion not to place an individual in expedited removal proceedings and instead to place them in ordinary removal proceedings before an immigration judge. It is also within ICE and CBP's discretion to refer an individual already in expedited removal proceedings to regular removal proceedings before an immigration judge, even if that individual has already received a negative credible fear determination.

## II.    Safeguards For Persons With Mental Incapacity In Removal Proceedings

208.    In the context of regular removal proceedings before an immigration judge, the Board of Immigration Appeals ("BIA") has emphasized the importance of fundamental fairness. *See Matter of Tomas*, 19 I&N Dec. 464, 465 (BIA 1987).

209.    In pursuit of such fairness, the INA provides for additional safeguards when an immigrant lacks mental competency. Title 8 U.S.C. § 1229a(b)(3) requires that, during removal proceedings, immigration judges "prescribe safeguards to protect the rights and privileges" of an immigrant who lacks mental competency.

210.    Several regulations provide further guidance on these safeguards. 8 C.F.R. §§
103.8(c)(2)(ii), 1240.4, 1240.10(c). Among such existing "safeguards" are that (1) immigration
judges ("IJ"s) are prohibited from accepting admissions of removability from an unrepresented
person who is incompetent and unaccompanied, 8 C.F.R. § 1240.10(c); (2) the government is
required to serve the notice to appear in court on a mentally incompetent individual's
representative, 8 C.F.R. § 103.5a(c)(2)(ii); and (3) a representative or guardian is permitted to
appear on behalf of a mentally incompetent individual in removal proceedings, 8 C.F.R. §
1240.4.

211.    Courts have also weighed in on what constitutes additional safeguards in this context.
The BIA in *Matter of M-A-M-*, 25 I&N Dec. 474, 477 (BIA 2011), stated that the INA's
"invocation of safeguards presumes that proceedings can go forward . . . provided the proceeding
is conducted fairly." *M-A-M-* explained that IJs can utilize a number of safeguards after assessing
the respondent's competency. *M-A-M-*, 25 I&N Dec. at 483.

212.    Under established BIA precedent, IJs have an affirmative duty to inquire into the mental
competence of individuals. If an applicant shows "indicia of incompetency," the IJ has an
independent duty to determine whether the applicant is competent. *Id.* at 480. Indicia can include
"the inability to understand and respond to questions, the inability to stay on topic, or a high
level of distraction," as well as "evidence of mental illness," *id.* at 479, such as the mental health
conditions suffered by parents who have been separated from their children.

213.    IJs "must take measures" to assess an individual's competence when there are indicia of
incompetence, such as questioning the individual simply, continuing proceedings to allow for
evidence gathering, allowing assistance from friends and family, asking the individual about his
or her psychiatric medication and its purpose and effects, and arranging for a psychiatric

evaluation. *Id.* at 480–81; *see also Matter of J-S-S-*, 26 I&N Dec. 679, 681–84 (BIA 2015)

(describing IJs' responsibilities in, and standards of proof for, determining competence).

214.    DHS also has obligations to assist the court in making a competency determination.

"DHS will often be in possession of relevant evidence, particularly where the alien is detained.

The DHS has an obligation to provide the court with relevant materials in its possession that

would inform the court about the respondent's mental competency." *M-A-M-*, 25 I&N Dec. at

480 (citing 8 C.F.R. § 1240.2(a); *Matter of S-M-J-*, 21 I. & N. Dec. 722, 726–27 (BIA 1997)).

215.    The BIA has also ordered immigration courts to make accommodations for people with

mental health conditions, regardless of whether the disability rises to the level of incompetence.

*Id*; *see also Matter of J-R-R-A-*, 26 I&N Dec. 609, 610–12 (BIA 2015) (requiring an

accommodation for a respondent with mental health issues without a formal finding of

incompetency). *Matter of J-R-R-A-* contemplates applicants who are deemed incompetent or who

have "a mental illness or serious cognitive disability" that "affect[s] [their] ability to provide

testimony in a coherent, linear manner." *Id.* at 611. Safeguards are to be applied where "a mental

health concern may be affecting the reliability of the applicant's testimony." *Id.* at 612.

216.    Where, as here, cognitive ability is impaired, including due to an inability to process and

retrieve information properly or communicate effectively, *see supra* Factual Background,

safeguards are appropriate and individuals are not competent to participate in any type of

immigration proceeding.

**III.    Safeguards Should Be Applied In the Credible Fear Interview Process.**

217.    Safeguards should be applied to expedited removal and the credible fear interview

process.

218.     Under 8 U.S.C. § 1225(b)(1)(B)(v), "credible fear of persecution" is defined as "a significant possibility, <u>taking into account the credibility of the statements made by the alien in support of the alien's claim</u> and such other facts as are known to the officer, that the alien could establish eligibility for asylum … " (emphasis added). That credibility cannot appropriately be assessed if the individual undergoing the interview is not competent to testify at the time of the interview.

219.     Regulations state that the purpose of the credible fear interview "shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear or persecution or torture." 8 C.F.R. 208.30(d). In credible fear interviews, immigrants are almost always solely relying on their own testimony in order to establish that they have a credible fear of persecution. "[A]ll relevant and useful information" cannot be elicited when the main purveyor of this information is incompetent to participate in the interview.

220.     Title 8 U.S.C. §1225(b) also allows for limited appeal to an immigration judge, where safeguard provisions clearly apply. The "elicit[ing] [of] all relevant and useful information" is not possible when an individual is not competent to present such information to the asylum officer, particularly where the only record before the Immigration Judge at the limited review stage is the underlying credible fear determination.

221.     When read in context, the credible fear provisions should be interpreted to provide safeguards for persons who are mentally incompetent or otherwise impaired from relating the circumstances that led to their fear or establishing their credibility, as in the instant case. *See* Cohen Decl. at 3.

222.     Without accommodation that takes these impairments into account, the credible fear provisions would be in conflict with the object and policy of the INA to provide additional

safeguards to immigrants who are unable to competently participate in their immigration proceedings, thereby undermining the fundamental fairness of those proceedings.

223.    The contrast between the reality of these parents' interviews and the guidance provided to interviewing officers in the asylum manual is also striking. For example, with regard to asylum interviews of individuals unable to testify on their own behalf due to mental incompetence, the manual states: "there may be cases in which an applicant manifests behavior that leads Asylum Office personnel to question the applicant's ability to provide competent testimony." Asylum Procedures Manual (2013). The Manual, furthermore, *assumes* that parents and children will be near each other for the interview, and though minor children may be dismissed for a portion of the interview, "[g]enerally, an AO should consult with the principal applicant to determine his or her preference before dismissing any dependent." *Id.* There is no meaningful reason that would mandate different procedures in the context of a credible fear interview.

224.    The asylum and credible fear provisions, read in their totality and within the overall context of the INA, require that individuals with mental health conditions, including acute trauma and anxiety related to family separation, be provided with procedural safeguards in their asylum and credible fear determinations.

## IV.    The Rehabilitation Act

225.    Section 504 of the Rehabilitation Act , 29 U.S.C. § 701 *et seq*. ("Rehab Act") provides in pertinent part that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or . . . conducted by any Executive agency." 20 U.S.C. § 794(a).

226.    Defendant agencies' implementing regulations, 6 C.F.R. §15.1 *et seq.* (DHS); 28 C.F.R.

§39.101 *et seq.* (DOJ), similarly mandate that Defendants not discriminate against individuals

with a disability or deny equal access to their programs and benefits on that basis. The DHS

regulations require the Department to operate each program or activity, when viewed in its

entirety, in a way that is "readily accessible to and usable by individuals with a disability." 6

C.F.R. § 15.50.

227.    The term "disability" means any physical or mental impairment that "*substantially limits*

*one or more major life activities*." 29 U.S.C. § 705. The Rehab Act and Americans with

Disabilities Act ("ADA")[19] also allow disability to be found based on a "record of such an

impairment" or "being regarded as having such an impairment." 29 U.S.C. § 705(20)(b); 42

U.S.C. § 12102(1).  Major life activities include "learning, reading, concentrating, thinking, and

working," as well as "the operation of a major bodily function, including . . . neurological, brain,

. . . [and] endocrine . . . functions." 42 U.S.C. § 12102(2)(A)–(B). The ADA mandates that

"[t]he definition of disability . . . be construed in favor of broad coverage of individuals . . . to the

maximum extent permitted by the terms of [the statute]." *Id.* § 12102(4)(A).

228.    The trauma-related mental disorders exhibited by plaintiffs satisfy the standard for

"disability" set out in the Rehab Act. *See, e.g., P.P. v. Compton United School District*, 135 F.

Supp. 3d 1098 (C.D. Cal. 2015) (finding mental health disabilities related to "trauma" and

"complex trauma" met the statutory requirement for a disability under the Rehabilitation Act);

*Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that the Rehabilitation Act requires

---

[19] To the extent possible, the Americans with Disabilities Act (ADA) and Rehabilitation Act are construed to impose similar requirements; thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 2012).

reasonable accommodations be provided for mental disabilities); *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1051 (C.D. Cal. 2010) (granting safeguards for mentally ill detainees in immigration court under the Rehabilitation Act).

229.    The trauma-related mental disorders exhibited by plaintiffs require accommodation under the Rehabilitation Act not only because parents were traumatized, but also because this trauma was predictably caused by Defendants' deliberate policies of forcibly separating parents from their children, then rushing parents through the credible fear process in an effort to deport them quickly from the United States.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violation of the Immigration and Nationality Act

230.    Plaintiffs incorporate each allegation in the foregoing paragraphs, as if fully set forth herein.

231.    Pursuant to 8 U.S.C. § 1252(e)(3), judicial review is available before this Court regarding whether "a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [8 U.S.C. § 1252(b)] is not consistent with applicable provisions of [the INA] or is otherwise in violation of law."

232.    The INA and its implementing regulations, including 8 U.S.C. § 1229a(b)(4)(B) and 8 C.F.R. 1240.10(a)(4), guarantee every noncitizen in removal proceedings a reasonable opportunity to present and object to evidence.

233.    In addition, the INA and its implementing regulations, including 8 U.S.C. § 1229a(b)(3) and 8 C.F.R. §§ 103.8(c)(2)(ii), 1240.4, 1240.10(c), require that additional safeguards be provided to immigrants who lack mental competency to protect their rights in removal

proceedings. These safeguards unquestionably apply during an Immigration Judge's review of a credible fear determination and should apply during credible fear interviews as well.

234.    The INA defines "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. 1225(b)(1)(B)(v).  That credibility cannot appropriately be assessed if the individual undergoing the interview is not competent to testify at the time of the interview.

235.    Regulations state that the purpose of the credible fear interview "shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. 208.30(d).

236.    Asylum seekers suffering from mental health conditions, such as trauma, depression, and anxiety as a result of being separated from their children qualify for additional procedural safeguards.

237.    To avoid inconsistency with the context and structure of the Immigration and Nationality Act, 8 U.S.C. § 1158 and 8 U.S.C. § 1225(b) must be read to require the provision of procedural safeguards during asylum and credible fear determinations for individuals with mental health conditions.

Defendants acted contrary to the INA and its implementing regulations when they caused parents to go through credible fear interviews without any accommodations or safeguards, despite the fact that they were suffering from trauma caused by the separation and unable to fully participate in their own interviews, and when Defendants applied unlawfully stringent standards for a finding of credible fear.

## SECOND CLAIM FOR RELIEF

## Violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

238.   Plaintiffs incorporate each allegation in the foregoing paragraphs, as if fully set forth herein.

239.   The Plaintiffs are qualified individuals with disabilities under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

240.   Defendants receive federal financial assistance to operate the citizenship and immigration services and related programs designed to support Plaintiffs.

241.   The regulations accompanying Section 504 provide that : "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

242.   These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

243.   Plaintiffs qualify for the immigration services provided by Defendants. Likewise, Plaintiffs would benefit from the immigration services and programs provided by Defendants.

244.   Defendants unlawfully discriminated against Plaintiffs by forcing them to participate in CFIs without providing a reasonable accommodation for the mental disability caused by Defendants generally applicable policy of separating immigrant parents from their children. Defendants also discriminated against Plaintiffs by denying them and/or excluding them from qualifying programs and/or activities due to their disabilities.

245.    Moreover, Defendants' practice has a disparate impact on Plaintiffs and mentally

disabled individuals, who are forced to participate in CFIs without a reasonable accommodation

and/or receive negative credible fear determinations due to their disabilities.

246.    Defendants would not have to fundamentally alter their programs or services to provide

Plaintiffs with a reasonable accommodation that would allow Plaintiffs to participate fully and

intelligibly in the CFI process.

### THIRD CLAIM FOR RELIEF

### Violation of the Due Process Clause of the Fifth Amendment

247.    Plaintiffs incorporate each allegation in the foregoing paragraphs, as if fully set forth

herein.

248.    The Due Process Clause requires that civil litigants, including immigrants in regular or

expedited removal proceedings, be provided with a meaningful opportunity to be heard by

removing obstacles to their full participation in judicial or administrative proceedings to which

they are entitled.

249.    Plaintiffs are entitled under the Due Process Clause to a fair hearing of their claims, and a

meaningful opportunity to establish their potential eligibility for asylum and related relief from

removal.

250.    In order to guarantee their fundamental right to fair adjudications under the Due Process

Clause, asylum seekers must be provided with a reasonable opportunity to make their case,

including in the credible fear interview process.

251.    By failing to provide Plaintiffs with a reasonable opportunity to be heard, by continuing

to force them through their credible fear interviews while they were too traumatized to

participate in those interviews, and by applying an unlawful standard for a finding of credible

fear, Defendants have violated Plaintiffs' Fifth Amendment right to due process.

## FOURTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act

252.    Plaintiffs incorporate each allegation in the foregoing paragraphs, as if fully set forth

herein.

253.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold

unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to

constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, or

limitations, or short of statutory right."

254.    Defendants' policy of continuing to force parents to undergo credible fear interviews

during the time they were separated from their children and traumatized by that separation is

arbitrary, capricious, contrary to law, and short of statutory right in multiple respects set forth in

the preceding paragraphs.

255.    By continuing to force Plaintiffs through their credible fear interviews, at unlawfully

difficult standards, while they were too traumatized to participate in those interviews, Defendants

have violated the Administrative Procedure Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

A.    Declare that the policy of forcing traumatized parents to undergo credible fear interviews without accommodations is contrary to law;

B.    Declare that the INA, the Rehab Act, and due process require the provision of accommodations for persons with mental disabilities who are undergoing credible fear interviews;

C.    Declare that Defendants' policy of relying on defective credible fear interviews to pursue expedited removal is contrary to law;

D.    Enjoin Defendants from conducting any further credible fear interviews for parents who are still separated from their children without providing reasonable accommodations;

E.    Enjoin Defendants from removing any individuals who have negative credible fear determinations and whose CFIs were conducted during the time they were separated from their children;

F.    Order that Defendants vacate negative credible fear determinations for all individuals who had CFIs during the time they were separated from their children;

G.    Order that Defendants provide a new opportunity for a credible fear interview under lawful standards and with reasonable accommodations for parents who underwent their original CFI during the time they were separated from their children and were given a negative fear finding, or in the alternative, place those individuals in ordinary removal proceedings where safeguards are available;

H.    Award Plaintiffs their reasonable costs and attorneys' fees pursuant to the Equal Access to Justice Act and any other applicable statutory or regulatory provisions; and

I.      Award such other further relief as the Court may deem just and proper.

DATED: August 17, 2018


Respectfully submitted,

By: /s/ Sirine Shebaya
    Sirine Shebaya (D.C. Bar No. 1019748)
    Johnathan Smith (D.C. Bar No. 1029373)
    Joseph (Yusuf) Saei*°
    MUSLIM ADVOCATES
    P.O. Box 34440
    Washington, D.C. 20043
    (202) 897-2622
    (202) 508-1007 (facsimile)
    johnathan@muslimadvocates.org
    sirine@muslimadvocates.org
    yusuf@muslimadvocates.org

    *application for pro hac vice admission
    forthcoming
    °admitted in California; supervised by
    members of the DC bar


    Simon Y. Sandoval-Moshenberg*
    simon@justice4all.org
    Sophia Gregg*
    sophia@justice4all.org
    LEGAL AID JUSTICE CENTER
    6066 Leesburg Pike, Suite 520
    Falls Church, VA 22041
    (703) 778-3450
    (703) 778-3454 (facsimile)

    *application for pro hac vice admission
    forthcoming

By: _Wm. G. Barm_
    Wilson G. Barmeyer (D.C. Bar No. 987107)
    Carol T. McClarnon* (D.C. Bar No. 452107)
    Samir A. Aguirre (D.C. Bar No. 999585)
    EVERSHEDS SUTHERLAND (US) LLP
    700 Sixth Street NW, Suite 700
    Washington, DC 20001
    (202) 383-0100
    (202) 637-3593 (facsimile)
    wilsonbarmeyer@evershedssutherland.com
    carolmcclarnon@eversheds-sutherland.com
    samiraguirre@eversheds-sutherland.com

    *admission application forthcoming


    John H. Fleming* (Georgia Bar No. 263250)
    Margaret L. Flatt* (Georgia Bar No. 201864)
    EVERSHEDS SUTHERLAND (US) LLP
    999 Peachtree Street NE, Suite 2300
    Atlanta, GA 30309
    (404) 853-8000
    (404) 853-8806 (facsimile)
    johnfleming@eversheds-sutherland.com
    margaretflatt@eversheds-sutherland.com

    *application for pro hac vice admission
    forthcoming

    Kara Ford* (New York Bar No. 5357967)
    EVERSHEDS SUTHERLAND (US) LLP
    The Grace Building, 40th Floor
    1114 Avenue of the Americas
    New York, NY 10036
    (212) 389-5000

(212) 389-5099 (facsimile)
karaford@eversheds-sutherland.com

*application for pro hac vice admission
forthcoming*

# EXHIBIT A

## DECLARATION OF AMY J COHEN, MD - On the Psychological-Cognitive Impact on Parents of Child Separation

My name is Amy J Cohen.  I am a physician licensed to practice medicine in the state of California.  I completed my medical school training at the Perelman School of Medicine at the University of Pennsylvania in 1984 and graduated with honors.  I completed a medical internship, adult psychiatric residency and child psychiatric fellowship at Harvard in 1989.  I have over 30 years of experience working with traumatized populations of both children and adults in the United States and abroad.

I have personally interviewed 11 individual parents - 3 men and 9 women - who arrived in the United States seeking asylum and had their children taken from them, some immediately, others within a day.  Marital status varied with some parents married, some separated, some unmarried in partnerships, some identified as single.  Age ranged from 27 to 48 years.  5 of these interviews were conducted by telephone and 6 were conducted in person at the Port Isabel Detention Center.  All were conducted between July 1 and July 15, 2018.  The average length of interviews was 90 minutes, although some lasted 70 minutes and a few over 120 minutes.  The purpose of these interviews was to gauge the mental status of these individuals following the trauma of the loss of their children and to ascertain whether and, if so, how the response to this trauma impacted their cognitive capacity, specifically their ability to engage in a structured interview ("Credible Fear Interview") which represented a critical juncture in their pursuit of asylum and in which they would be required to process sometimes complex questions and to formulate accurate answers based on their memories of often highly charged circumstances in their home countries.  In short, I was asked to evaluate whether these parents were disabled as manifest in their cognitive capacity/competency to engage in these interviews while still separated from their children.

As the "zero tolerance" policy which has resulted in mass child-parent separations in the United States is itself unique, there is no specific literature pertaining to the morbidity associated with such an event.  However, much can be drawn from the extensive literature which examines parental response to the *death* of a child as well as some which describes parental response to *kidnapping*.

Sudden death and kidnapping of a child are both events which represent the closest parallel to the experience of these parents.  Without preparation or the capacity to intervene, these parents had their children taken from them, sometimes forcefully and even violently.  Many were told that they would never see their children again.  All were left in a state of terror and uncertainty - several for weeks - not knowing if their children were safe or even alive.  Even when put in communication with their children, they were not permitted to know where their children were, when or if they would see them again.  In the brief allotment of time given to some of the parents to communicate by telephone, all of their children expressed fear, distress and desperation to see their parents again.  Yet parents were rendered quite helpless, prevented from adequately comforting or protecting their children, from holding or touching them (essential to the comfort of younger children in particular), from offering any answers.  Some parents were offered no opportunity to speak with their children for weeks and wondered if their children were alive, if they'd ever hear their voices again.  All were frightened and consumed by the certainty that their children were suffering while not knowing what potential horrors their children might be enduring.

It is well known that the trauma of child loss is nearly unparalleled in its impact on the minds and bodies of parents.  Every single parent described the moment that their children were taken from them as the single most vividly horrifying experience of their lives: "shattering" "unbearable", "a nightmare".

All of the parents I interviewed described their identity as parents/providers/nurturers as the single most important role in their lives. They view their capacity to nurture and protect their children as their first and most important responsibility. Histories of these parents included multiple rapes, the cutting of one father's throat with a machete, exposure to constant and unpredictable, life-threatening violence. Yet for all, it was the rescuing of their children from terrible danger that was the prime motivation for the undertaking of the perilous journey to the United States. All spoke of the efforts made to nurture and protect their children on the trip. Most went without food or water in order to give those rations to their children. Some who had been kidnapped on the journey wept in shame that they were not able to protect their children from the fearfulness of that experience.

As with any stressor, the impact of trauma is a product of the severity of the event (in this case, extremely severe) and the relative resilience of the victim. These parents arrived in the United States already worn down by circumstances which left them even more susceptible to the destructive impact of the loss of their children. All had endured a protracted period of fear and violence in their own countries before making the difficult decision to leave. Wishing to keep their families safe, many had come with only part of their family and were forced to leave spouses and other children behind. Despite having made provisions for them, all worried about and missed the family members not with them. Many had endured tremendous physical hardship or violence before leaving and arrived physically weakened by a long journey with very little food or water.

All of the parents interviewed described severe symptoms arising from all four categories of traumatic response and qualified for the diagnosis of an Acute Stress Response. [The categories of impairment for ASR are identical to those for PTSD. However, at the time of their Credible Fear Interviews, one month had not yet passed since the trauma of child separation and so they did not yet qualify for the diagnosis of PTSD.]

All described "Intrusion Symptoms" with involuntary distressing memories of the moment their children were taken from them and the aftermath during which, in some cases, guards would behave cruelly, telling them that they would never see their children again. Many had frank "flashbacks": A kind of waking nightmare in which the moment of separation would suddenly be relived, as if it was happening again. Some would "hear" the harsh words of the guards as if they were being spoken again and would turn around to find no one. Nearly all had profoundly distressing dreams with content related to their situation: "I see my child and she is calling for me but I'm tied up in chains and can't get to her. I scream for someone to help but nobody comes". Most events in the course of the day would trigger associations to their trauma: for example, for many mealtime evoked the last time they'd eaten with their child or worry about whether their child was being fed and cared for. All had severe sleep disturbances, not only because of nightmares which would jolt them awake but also because bedtime often invited the most obsessional reliving of the loss of their child and acute worries about his or her wellbeing. All reported that these experiences and feelings left them exhausted, robbed them of their appetite, led to palpitations and headaches.

"Avoidance Symptoms" were less relevant in this population, as it was impossible to avoid associations with the original event. But several spoke of seeing detention guards who reminded them of those who had taken their child and doing all they could to avoid encounters with these guards.

All described "Negative alterations in cognition and mood" related to the trauma. Many were unable to defend against the fear that their children were being more actively harmed: physically or sexually abused. All felt confused and uncertain about information given to them about their children. All felt that they would never be the same again. Many believed that at night they heard the sound of children crying or speaking despite there being no children in the detention

facility. All described a persistent experience of profound suffering and misery and the inability to distract themselves even for a moment from the anxiety and depression which consumed them. None was able to muster any interest in any activity not related to their children other than reading their bible for comfort.

All experienced "Marked alterations in arousal and reactivity". This was generally manifest by a chronic experience of anxiety or fear with an exaggerated startle response. All described difficulty relaxing or sitting still, most with a marked restlessness and tremulousness. All reported palpitations and sleep disturbances beyond their obsessionality and nightmares. All awoke frequently and/or early with difficulty getting back to sleep and a feeling of persistent dread upon awakening.

Taken together these symptoms resulted in significant both physiological and psychological impairments. Many reported significant weight loss, general weakness and unwellness. Many had persistent headaches. Several had developed new gastrointestinal symptoms: abdominal pain and cramping, nausea, diarrhea. Many felt chronically lightheaded.

Most notably within this context, all described an inability to think clearly: to process information, to organize information, to retrieve memories in full. All described difficulty focusing, with many reporting frequently losing track of conversations, sometimes losing even the thread of their own thoughts or words. None were able to describe priorities beyond that of getting their children back and none were able to think in broader, abstract strategic terms. Despite all appearing highly engaged in our interviews which were open-ended and unpressured, many misheard or required repetition of questions. All had difficulty processing or expressing some of their answers.

For those who had taken their Credible Fear Interview at the time of my assessment, all described the experience as painful and confusing. Many reported that they'd informed the interviewers that they felt unable to answer the questions due to their distress over the loss of their children, but were told they must do so anyway, to "just answer yes or no". Many have reported that they have little to no memory of the interview, that they were barely able to speak because they were weeping throughout, that they were unable to hear the questions because they were so distracted by their worry about their children, that they were unable to retrieve the information necessary to answer questions.

CONCLUSION: The parents I interviewed were severely impaired both cognitively and physiologically by the trauma they endured in the sudden, often violent removal of their children from their care and the attendant uncertainty of their children's whereabouts and well-being. The impact of this trauma had been global and led to a myriad of impairments, several within the sphere of cognition.

These impairments would meet the legal definition of a "disability" in that that they substantially limited the capacity of these individuals to engage in an array of major life activities, including their Credible Fear Interviews.

As a consequence of symptoms arising from the trauma of their loss, these parents would not have been cognitively competent to process the questions or formulate answers to any fact-based, time-limited interview.  Indeed, their distraction by concerns for their children impaired even their ability to appreciate the importance of the interview in determining the fate of their asylum claims.

I believe the broad sample of parents interviewed (some married, others single, fathers and mothers, an age range from 27 to 48) may be fairly considered to represent the class of parents impacted by the extreme trauma of this child-parent separation.

In short, it is my professional opinion that all parents who endured the "zero tolerance" traumatic separation from their children and remain separated from them should be considered now and in the past incapable of perceiving and acting in their own interest, legally disabled, and cognitively too impaired to engage in a Credible Fear Interview.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Amy J Cohen MD                                              08/15/18

**EXHIBIT B**



**Statement on the Impact of Parent-Child Separation on Parents' Ability to Effectively Participate in Asylum Proceedings**

This statement was prepared by members of the Stanford Early Life Stress and Pediatric Anxiety Program (ELSPAP) and Human Rights in Trauma Mental Health Program (HRTMH), part of Stanford's Department of Psychiatry and Behavioral Sciences. ELSPAP is a multidisciplinary team with expertise in childhood trauma and posttraumatic stress. We aim to address the impact that trauma has on child development and family functioning through three core components: research, clinical work, and community outreach. HRTMH advances and applies the impact of trauma on survivors of human rights abuses with an eye towards informing transitional justice and judicial processes.

Parents/caregivers who have been separated from their children while presenting for political asylum are required to participate in typical asylum proceedings, including credible fear interviews. However, the trauma of separation/disruption is likely to negatively impact parents'/caregivers' ability to effectively participate in this process. The current statement provides a review of the psychological theory, literature, and empirical evidence relevant to this issue.

**Impact of Parent-Child Separation/Disruption on Attachment**

Attachment is a scientifically researched life milestone that ensures the psychological and physical well-being of the attached individual (Bowlby, 1982). Humans are biologically pre-programmed to form attachments with others (especially children and parents/caregivers) because it guarantees survival. A secure attachment, in which caregivers are available and receptive to their child when needed (Ainsworth et al., 1978), provides safety and healthy development of self-esteem, eagerness to learn, trust, and self-reliance and, thus, is crucial for an individual's psychological, cognitive, neurobiological, and social development. The attachment relationship not only is important for child development, but also is critical for parents'/caregiver's growth and well-being (Bowlby, 1952). Therefore, ruptures in attachment can have a devastating impact on both the child and the parent/caregiver. Research has shown that ruptures in parent-child attachment (due to experiences such as trauma, loss, and separation) are associated with significant parental/caregiver distress and impairment in functioning (Bowlby, 1940; Glasgow & Gouse-Sheese, 1995; Mena et al., 2008; Suárez-Orozco, Bang, & Kim, 2011). Forced separation/disruption during immigration is a unique form of separation due to the inherent uncertainty. This may lead parents to experience

1

"ambiguous loss," a situation in which there is no certainty that their child will return the way he/she used to be (Boss, 2002). Since this loss cannot be reconciled with the uncertainty, the grief process is frozen. The impact of such a loss inhibits parents'/caregivers' cognitive functioning, which significantly impairs their coping and decision-making capabilities. In his report to the World Health Organization, Bowlby suggested that there are critical periods during separation/disruption and reunification that play a role in mitigating the harmful, long-lasting effects on parent-child attachment (Bowlby, 1952). He concluded, and a wealth of other research has since shown, that the greater the degree and length of the separation/disruption the more there is potential for irreversible damage.

### Parent-child Separation/Disruption is a Source of Trauma and Traumatic Stress

In addition to the impact on attachment, forced and unexpected separation/disruption of an individual from her/his loved ones is a source of trauma and traumatic stress. The Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5; American Psychiatric Association, 2013) specifies the first criterion (Criterion A) for post-traumatic stress disorder (PTSD) as including "exposure to actual or threatened death, serious injury, or sexual violence" through direct experience, witnessing, or learning that the event occurred to a close family member or close friend. In the case of forced family separation/disruption, parents/caregivers are faced with a significant threat to their child's well-being; from the parents'/caregivers' perspective, the child is under threat and in danger of experiencing physical violence (with potential to result in serious physical injury), sexual violation, or even death.  It is our opinion that forced family separation/disruption therefore meets Criterion A for PTSD. As a result, we can expect many parents/caregivers to experience the symptoms of PTSD following the separation/disruption from their children; such symptoms include intrusive thoughts and feelings (e.g., unwanted memories, flashbacks, nightmares), avoidance of trauma reminders (thoughts, feelings, and external stimuli), negative mood and cognition (e.g., memory difficulty, negative thoughts about the world), and hyperarousal (e.g., difficulty concentrating, irritability, hypervigilance). Not all of these symptoms are necessary in order to experience functional impairment. Furthermore, it is widely known that exposure to traumatic events and threats to an individual's or loved one's well-being commonly results in a wide array of psychological symptoms beyond PTSD (Briere & Scott, 2015), such as depression, anxiety, dissociation, mood instability, and psychosis. These symptoms of trauma-related distress can be expected to severely affect parents'/caregivers' ability to provide coherent testimony, recounting, and narrative in asylum proceedings, as will be discussed further in this declaration.

In addition to the traumatic impact of the singular experience of family separation/disruption, additional characteristics of asylum-seeking parents'/caregivers' forced separation/disruption from their children are expected to significantly exacerbate the symptoms of traumatic distress. First, as mentioned above, the traumatic separation/disruption is ongoing, the loss is ambiguous, and there is undetermined resolution. Without having any expectation or knowledge of children's well-being or plans for reunification, parents'/caregivers' distress will be continually heightened. Extended chronicity and duration of the trauma or related threat are known to increase the

frequency and severity of trauma-related psychological symptoms (Ford et al., 2015). Second, parents/caregivers experience a significant loss of control and helplessness in this situation. They have little or no knowledge of their children's whereabouts or well-being, and minimal control over the outcomes for their children. The lack of perceived control during traumatic events engenders a sense of helplessness, which exacerbates trauma-related distress and negative psychological outcomes (Ford et al., 2015).

Similarly, parents'/caregivers' inability to contact, comfort, and communicate with their children reduces their sense of control, and in many cases strips them of the opportunity to perform their highest priority function in society: to care for and ensure the well-being of their offspring. When individuals are prevented from executing their societal roles and functions, they can be expected to experience psychological distress; once again, this will exacerbate the symptoms related to the trauma of separation/disruption. Finally, asylum-seeking parents/caregivers have inherently experienced prior traumatic events in their lives, as this constitutes the basis for seeking asylum. Traumatic stress is cumulative, and exposure to multiple or repeated traumatic events over the lifespan has been shown to increase risk, severity, and complexity of trauma-related symptoms (Cloitre et al., 2009). Therefore, the trauma of forced family separation/disruption compounds the prior traumas experienced by parents/caregivers (commonly including violence exposure, abuse, and traumatic loss) with the expected impact of significantly worsening psychological outcomes, levels of functioning, and ability to effectively engage in asylum proceedings. A growing body of empirical research has indeed demonstrated that parent-child separation/disruption during immigration processes (as well as corresponding parental detention and threat of deportation) is associated with increased risk, rates, and severity of mental health problems for parents/caregivers (Brabeck & Xu, 2010; Linton, Griffin, & Shapiro, 2017; Rusch & Reyes, 2013; Suárez-Orozco, Bang, & Kim, 2011).

## Neurobiological Effects of Stress

Traumatic stress, such as being separated from one's child as described above, has measurable effects on neurobiological and physiological functioning. When humans experience a stressor, physiological and mental resources are diverted to responding to the stressor (Ulrich-Lai and Herman, 2009). This response involves engagement of emotion processing centers of the brain, release of stress hormones, and activation of the sympathetic nervous system, resulting in a "fight, flight, or freeze" reaction. Under these circumstances, the human brain focuses on surviving the immediate threat, and other areas of the brain essentially go on lockdown until the threat is resolved. Thus, more complex cognitive functions are impaired while the body focuses on maintaining safety. Executive functioning, or the ability to solve problems, evaluate consequences, and make decisions, is particularly vulnerable to the effects of stress (Arnsten, 2009).

As described above, forced separation/disruption during the immigration process involves an ongoing, ambiguous, unresolved stressor. This experience greatly disrupts and diminishes organization, planning, and problem-solving. In addition, remaining in this heightened state of stress response can lead to physical and mental exhaustion, likely exacerbated by lack of sleep in parents/caregivers detained and separated from their children. Thus, the traumatic stress of forced separation/disruption from children puts a

parent/caregiver at an extreme disadvantage in the capacity to navigate the process of getting out of expedited removal proceedings, submitting a claim for asylum, and completing a credible fear interview.

## Impaired Ability to Conduct Interviews and Provide Testimony

As previously discussed, parents/caregivers separated from their children are likely experiencing symptoms of PTSD and additional mental health difficulties. Of particular concern is the impact on cognitive functioning related to the neurobiological stress response. Research has consistently found that several cognitive functions, including but not limited to attention, communication, and memory, are significantly impaired in individuals with PTSD and traumatic distress (Flaks et al., 2014; Olff, Polak, Witteveen, & Denys, 2014). In terms of attention, abnormalities in concentration, shifting of attention, and working memory capacity are common (Flaks et al., 2014; Olff et al., 2014), largely due to intrusive and distressing memories and thoughts (Flaks et al., 2014). In regard to forced family separation/disruption, parents/caregivers can be expected to struggle with memories of being separated from their children and ongoing thoughts of concern for their wellbeing. Parents/caregivers are expected to be overwhelmed and preoccupied by their concern for their children, with their functioning dictated by the automatic "fight, flight, or freeze" responses that effectively render them incapable of focusing on secondary priorities or other historical events. Therefore, despite their intentions and efforts, they will likely experience difficulties in maintaining focus and processing information appropriately, negatively affecting their ability to participate in asylum proceedings and credible fear interviews.

In addition to impairing attention, intrusive and distressing memories and thoughts interfere with the ability to effectively recall information (Flaks et al., 2014; Schweizer & Dalgleish, 2011). Specifically, memories become fragmented and disorganized as well as difficult to retrieve (Polak et al., 2014; Schweizer & Dalgleish, 2011). This means that while individuals may recall sensations and emotions associated with a memory, they tend to encounter difficulties in retrieving details or in providing consistent and coherent retelling of events (Schweizer & Dalgleish, 2011). Further, emotionally-laden information is typically affected to a greater degree than emotionally-neutral information (Schweizer & Dalgleish, 2011). Thus, providing emotional narratives of events is particularly difficult for individuals experiencing symptoms of PTSD and trauma-related distress. This is especially true for asylum seekers with PTSD, who have been shown to demonstrate poorer memory specificity (Graham, Herlihy, & Brewin, 2014). In the case of forced family separation/disruption, even when attention is not diverted to separation from their children, parents/caregivers can be expected to experience difficulties in recalling information regarding their fears of persecution in their home countries. This may result in failing to provide important and relevant details to support their cases, negatively impacting their ability to provide comprehensive and compelling information in asylum proceedings. These difficulties are even further exacerbated in the case of currently separated parents/caregivers, as their trauma is ongoing and unresolved (thus heightening the frequency and severity of the traumatic stress response and related symptoms).

Additionally, memories, including those of traumatic events, are naturally susceptible to misinformation effects (Paz-Alonso & Goodman, 2008). Misinformation effects occur when an individual's recall of episodic memories become less effective due to post-event information (Paz-Alonso & Goodman, 2008). This is further perpetuated by a delay between memory formation and memory recall (Paz-Alonso & Goodman, 2008). Thus, as more time passes, and new information is processed, preexisting memories become more difficult to effectively and coherently retrieve. In the case of forced family separation/disruption, parents/caregivers are expected to exhibit increasing difficulty in recalling information prior to separation/disruption. In addition, repeated attempts to report traumatic events in a detailed manner may exacerbate current symptoms of PTSD and trauma-related distress, which may be derived from child separation/disruption or other factors of the pre- and post-migration process including but not limited to insecurity regarding legal status and fear of repatriation (Schock, Rosner, & Knaevelsrud, 2015). The aforementioned cognitive impairments associated with PTSD have an overwhelming effect on communication. Further, they have been found to negatively impact the ability to effectively provide court testimony. Thus, it is expected that parents/caregivers experiencing these deficits will struggle to provide detailed and coherent testimony in asylum proceedings.

Signed,

Victor Carrion, MD, Professor, Director of ELSPAP

Hilit Kletter, PhD, Clinical Assistant Professor, Director of Trauma Programs

Ryan Matlow, PhD, Clinical Assistant Professor, Director of Community Research Programs

Daryn Reicherter, Clinical Professor, Director of HRTMH

Helen Wilson, PhD, Clinical Associate Professor, Director of Confidential Support Team

Michael Hamilton, MA, Graduate Student Researcher, HRTMH

Alex Lugo, BA, Graduate Student Researcher, HRTMH

## References

Ainsworth, MDS, Blehar, MC, Waters, E, & Wall, S (1978). *Patterns of Attachment: A Psychological Study of the Strange Situation*. Hillsdale, New Jersey: Lawrence Erlbaum Associates.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.

Arnsten AFT. Stress signalling pathways that impair prefrontal cortex structure and function. *Nature Reviews Neuroscience.* 2009;10:410-422.

Boss, P (2002). *Family stress management: A contextual approach* (2nd ed.). Thousand Oaks, CA: Sage.

Bowlby, J (1940). The influence of early environment in the development of neurosis and neurotic character. *International Journal of Psycho-Analysis*, 2, 1-25.

Bowlby, J (1952). *Maternal care and mental health : a report prepared on behalf of the World Health Organization as a contribution to the United Nations programme for the welfare of homeless children* / John Bowlby, 2nd ed. Geneva : World Health Organization.

Bowlby, J (1982). Attachment and Loss: Retrospect and Prospect. *American Journal of Orthopsychiatry*, 52(4), 664-678.

Brabeck, K. & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioral Sciences, 32(3)*, 341-361.

Briere, J & Scott, C (2015). Complex Trauma in Adolescents and Adults. *The Psychiatric Clinics of North America, 38(3),* 515-527.

Cloitre, M., Stolbach, B. C., Herman, J. L., van der Kolk, B., et al. (2009). A developmental approach to complex PTSD: Childhood and adult cumulative trauma as predictors of symptoms complexity. *Journal of Traumatic Stress, 22,* 399-408.

Flaks, M. K., Malta, S. M., Almeida, P. P., Bueno, O. F. A., Pupo, M. C., Andreoli, S. B., Mello, M. F., Lacerda, A. L. T., Mari, J. J., & Bressan, R. A. (2014). Attentional and executive functions are differentially affected by post-traumatic stress disorder and trauma. *Journal of Psychiatric Research, 48*, 32-39.

Ford, J.D., Grasso, D.J., Elhai, J.D., & Courtois, C.A. (2015). Etiology of PTSD: What causes PTSD? *Posstraumatic Stress Disorder: Scientific and Professional Dimensions* (2nd Ed.) (pp. 81-132). Academic Press.

Graham, B., Herlihy, J., & Brewin, C. R. (2014). Overgeneral memory in asylum seekers and refugees. *Journal Of Behavior Therapy And Experimental Psychiatry, 45*(3), 375-380.

Glasgow GF, Gouse-Sheese J (1995). Theme of rejection and abandonment in group work with Caribbean adolescents. *Social Work Groups*, 17(4), 3–27.

Linton, J.M., Griffin, M., Shapiro, A.J. (2017). Detention of immigrant children. *Pediatrics, 139(5)*: e20170483.

Mena, MP, Mitrani, VB, Mason, CA, Muir, JA, Santisteban, DA (2008). Extended parent-child separations: Impact on adolescent functioning and possible gender differences. *Journal for Specialists in Pediatric Nursing*, 13 (1), 50-52.

Olff, M., Polak, A. R., Witteveen, A. B., & Denys, D. (2014). Executive function in posttraumatic stress disorder (PTSD) and the influence of comorbid depression. *Neurobiology Of Learning And Memory, 112,* 114-121.

Paz-Alonso, P. M., & Goodman, G. S. (2008). Trauma and memory: Effects of post-event misinformation, retrieval order, and retention interval. *Memory, 16*(1), 58-75.

Rusch, D., & Reyes, K. (2013). Examining the effects of Mexican serial migration and family separations on acculturative stress, depression, and family functioning. *Hispanic Journal of Behavioral Sciences, 35(2),* 139-158.

Schock, K., Rosner, R., & Knaevelsrud, C. (2015). Impact of asylum interviews on the mental health of traumatized asylum seekers. *European Journal of Psychotraumatology, 6*(1), 26286.

Schweizer, S. & Dalgleish, T. (2011). Emotional working memory capacity in posttraumatic stress disorder (PTSD). *Behavior Research and Therapy, 49*, 498-504.

Suárez-Orozco, C., Bang, H.J., & Kim, H.Y. (2011).  I felt like my heart was staying behind: Psychological implications of family separations and reunifications for immigrant youth. *Journal of Adolescent Research, 26(2),* 222-257.

Ulrich-Lai YM, Herman J. Neural regulation of endocrine and autonomic stress responses. *Nature Reviews Neuroscience.* 2009;10:397-409.

# EXHIBIT C



Official website of the Department of Homeland Security

**U.S. Department of
Homeland Security**

Enter Search Term

On DHS.gov

# Fact Sheet: Zero-Tolerance Prosecution and Family Reunification

**Release Date:** June 23, 2018

The Department of Homeland Security (DHS) and Health and Human Services (HHS) have a process established to ensure that family members know the location of their children and have regular communication after separation to ensure that those adults who are subject to removal are reunited with their children for the purposes of removal. The United States government knows the location of all children in its custody and is working to reunite them with their families.

As part of the apprehension, detention and prosecution process, illegal aliens, adults and children, are initially detained by U.S. Customs and Border Protection (CBP) before the children are sent to HHS' Office of Refugee Resettlement (ORR) and parents to Immigration and Customs Enforcement (ICE) custody. Each entity plays a role in reunification.  This process is well coordinated.

## U.S. Customs and Border Protection

- CBP has reunited 522 Unaccompanied Alien Children (UAC) in their custody who were separated from adults as part of the Zero Tolerance initiative.  The reunions of an additional 16 UAC who were scheduled to be reunited on June 22, 2018 were delayed due to weather affecting travel and we expect they will all be reunited with their parents within the next 24 hours.  There will be a small number of children who were separated for reasons other than zero tolerance that will remain separated: generally only if the familial relationship cannot be confirmed, we believe the adult is a threat to the safety of the child, or the adult is a criminal alien.

- Because of the speed in which adults completed their criminal proceedings, some children were still present at a United States Border Patrol (USBP) station at the time

their parent(s) returned from court proceedings. In these cases, the USBP reunited the family and transferred them, together, to ICE custody as a family unit.

# U.S. Immigration and Customs Enforcement

- U.S. Immigration and Customs Enforcement (ICE) has dedicated the Port Isabel Service Processing Center (https://www.ice.gov/detention-facility/port-isabel-service-processing-center) (PIDC) in the San Antonio Field Office area as the primary facility to house alien parents or legal guardians going through the removal process. No children will be housed at the facility.

- PIDC is intended to serve the unique needs of detained parents and legal guardians of minors in HHS/ORR custody by helping to facilitate communication with their children and to help parents make informed decisions about their child.

- ICE will work with the adults to provide regular communication with their children through video teleconferencing, phone, and tablets at PIDC and other detention locations where these parents are detained.

- Where a child is in the care and custody of HHS/ORR, ICE works with ORR to reunite the parent and child at the time of removal and with the consulate to assist the parent to obtain a travel document for the child.

- Once the parent's immigration case has been adjudicated by U.S. Citizenship and Immigration Services (USCIS) and/or the Executive Office for Immigration Review (EOIR), ICE will seek to reunite verified family units and link their removal proceedings so that family units can be returned to their home countries together.

ICE has completed the following steps toward reunification:

- Implemented an identification mechanism to ensure on-going tracking of linked family members throughout the detention and removal process;

- Designated detention locations for separated parents and will enhance current processes to ensure communication with children in HHS custody;

- Worked closely with foreign consulates to ensure that travel documents are issued for both the parent and child at time of removal; and

- Coordinated with HHS for the reuniting of the child prior to the parents' departure from the United States.

# U.S. Health and Human Services Office of Refugee Resettlement

- Minors come into HHS custody with information provided by DHS regarding how they illegally entered the country and whether or not they were with a parent or adult and, to the extent possible, the parent(s) or guardian(s) information and location. There is a central database which HHS and DHS can access and update when a parent(s) or minor(s) location information changes.

- As of June 20th HHS has 2,053 separated minors being cared for in HHS funded facilities, and is working with relevant agency partners to foster communications and work towards reuniting every minor and every parent or guardian via well-established reunification processes. Currently only 17% of minors in HHS funded facilities were placed there as a result of Zero Tolerance enforcement, and the remaining 83% percent arrived to the United States without a parent or guardian.

- Parent(s) or guardian(s) attempting to determine if their child is in the custody of the Office of Refugee Resettlement (ORR) in HHS Administration for Children and Families should contact the ORR National Call Center (www.acf.hhs.gov/orr/resource/orr-national-call-center (http://www.acf.hhs.gov/orr/resource/orr-national-call-center)) at 1-800-203-7001, or via email information@ORRNCC.com (mailto:information@ORRNCC.com). Information will be collected and sent to HHS funded facility where minor is located. The ORR National Call Center has numerous resources available for children, parent(s), guardian(s) and sponsors.

- Within 24 hours of arriving at an HHS funded facility minors are given the opportunity to communicate with a vetted parent, guardian or relative. While in HHS funded facilities' care, every effort is made to ensure minors are able to communicate (either telephonic or video depending on the circumstances) with their parent or guardian (at least twice per week). However, reasonable safety precautions are in place to ensure that an adult wishing to communicate with a minor is in fact that minor's parent or guardian.

- Minors in HHS funded facilities are permitted to call both family members and/or sponsors living in the United States and abroad. Attorneys representing minors have unlimited telephone access and the minor may speak to other appropriate stakeholders, such as their consulate, the case coordinator, or child advocate. Additional information on telephone calls, visitation, and mail policies are available in the policy guide. (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied)

Fact Sheet: Zero-Tolerance Prosecution and Family Reunification | Homeland Security

- Under HHS' publicly available (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied) policy guide for Unaccompanied Alien Children, the Office of Refugee Resettlement (ORR) releases minors to sponsors in the following order of preference: parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody.

Topics:   Border Security (/topics/border-security), Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords:   Border Security (/keywords/border-security), Family detention (/keywords/family-detention), immigration enforcement (/keywords/immigration-enforcement), UAC (/keywords/uac), Unaccompanied Alien Children (/keywords/unaccompanied-alien-children)

Last Published Date: June 26, 2018

**EXHIBIT D**



**EXECUTIVE ORDERS**

# Affording Congress an Opportunity to Address Family Separation

IMMIGRATION

Issued on: **June 20, 2018**

★ ★ ★

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, it is hereby ordered as follows:

Section 1.  Policy.  It is the policy of this Administration to rigorously enforce our immigration laws. Under our laws, the only legal way for an alien to enter this country is at a designated port of entry at an appropriate time.  When an alien enters or attempts to enter the country anywhere else, that alien has committed at least the crime of improper entry and is subject to a fine or imprisonment under section 1325(a) of title 8, United States Code.  This Administration will initiate proceedings to enforce this and other criminal provisions of the INA until and unless Congress directs otherwise.  It is also the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources.  It is unfortunate that Congress's failure to act and court orders have put the Administration in the position of separating alien families to effectively enforce the law.

Sec. 2.  Definitions.  For purposes of this order, the following definitions apply:

(a)  "Alien family" means

    (i)  any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an

alien child or alien children at or between designated ports of entry and who was detained; and

(ii)  that person's alien child or alien children.

(b)  "Alien child" means any person not a citizen or national of the United States who

(i)   has not been admitted into, or is not authorized to enter or remain in, the United States;

(ii)  is under the age of 18; and

(iii) has a legal parent-child relationship to an alien who entered the United States with the alien child at or between designated ports of entry and who was detained.

Sec. 3.  Temporary Detention Policy for Families Entering this Country Illegally.  (a)  The Secretary of Homeland Security (Secretary), shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members.

(b)  The Secretary shall not, however, detain an alien family together when there is a concern that detention of an alien child with the child's alien parent would pose a risk to the child's welfare.

(c)  The Secretary of Defense shall take all legally available measures to provide to the Secretary, upon request, any existing facilities available for the housing and care of alien families, and shall construct such facilities if necessary and consistent with law.  The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

(d)  Heads of executive departments and agencies shall, to the extent consistent with law, make available to the Secretary, for the housing and care of alien families pending court proceedings for improper entry, any facilities that are appropriate for such purposes.  The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

(e)  The Attorney General shall promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in *Flores v. Sessions*, CV 85-4544 ("*Flores settlement*"), in a manner that would permit the Secretary, under present resource constraints, to

detain alien families together throughout the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings.

Sec. 4. Prioritization of Immigration Proceedings Involving Alien Families. The Attorney General shall, to the extent practicable, prioritize the adjudication of cases involving detained families.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

    (i) the authority granted by law to an executive department or agency, or the head thereof; or

    (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

June 20, 2018.