DECLARATION OF AMY J COHEN, MD - On the Psychological-Cognitive Impact on Parents of Child Separation

My name is Amy J Cohen.  I am a physician licensed to practice medicine in the state of California.  I completed my medical school training at the Perelman School of Medicine at the University of Pennsylvania in 1984 and graduated with honors.  I completed a medical internship, adult psychiatric residency and child psychiatric fellowship at Harvard in 1989.  I have over 30 years of experience working with traumatized populations of both children and adults in the United States and abroad.

I have personally interviewed 11 individual parents - 3 men and 9 women - who arrived in the United States seeking asylum and had their children taken from them, some immediately, others within a day.  Marital status varied with some parents married, some separated, some unmarried in partnerships, some identified as single.  Age ranged from 27 to 48 years.  5 of these interviews were conducted by telephone and 6 were conducted in person at the Port Isabel Detention Center.  All were conducted between July 1 and July 15, 2018.  The average length of interviews was 90 minutes, although some lasted 70 minutes and a few over 120 minutes.  The purpose of these interviews was to gauge the mental status of these individuals following the trauma of the loss of their children and to ascertain whether and, if so, how the response to this trauma impacted their cognitive capacity, specifically their ability to engage in a structured interview ("Credible Fear Interview") which represented a critical juncture in their pursuit of asylum and in which they would be required to process sometimes complex questions and to formulate accurate answers based on their memories of often highly charged circumstances in their home countries.  In short, I was asked to evaluate whether these parents were disabled as manifest in their cognitive capacity/competency to engage in these interviews while still separated from their children.

As the "zero tolerance" policy which has resulted in mass child-parent separations in the United States is itself unique, there is no specific literature pertaining to the morbidity associated with such an event.  However, much can be drawn from the extensive literature which examines parental response to the *death* of a child as well as some which describes parental response to *kidnapping*.

Sudden death and kidnapping of a child are both events which represent the closest parallel to the experience of these parents.  Without preparation or the capacity to intervene, these parents had their children taken from them, sometimes forcefully and even violently.  Many were told that they would never see their children again.  All were left in a state of terror and uncertainty - several for weeks - not knowing if their children were safe or even alive.  Even when put in communication with their children, they were not permitted to know where their children were, when or if they would see them again.  In the brief allotment of time given to some of the parents to communicate by telephone, all of their children expressed fear, distress and desperation to see their parents again. Yet parents were rendered quite helpless, prevented from adequately comforting or protecting their children, from holding or touching them (essential to the comfort of younger children in particular), from offering any answers.  Some parents were offered no opportunity to speak with their children for weeks and wondered if their children were alive, if they'd ever hear their voices again.  All were frightened and consumed by the certainty that their children were suffering while not knowing what potential horrors their children might be enduring.

It is well known that the trauma of child loss is nearly unparalleled in its impact on the minds and bodies of parents.  Every single parent described the moment that their children were taken from them as the single most vividly horrifying experience of their lives: "shattering" "unbearable", "a nightmare".

All of the parents I interviewed described their identity as parents/providers/nurturers as the single most important role in their lives.  They view their capacity to nurture and protect their children as their first and most important responsibility.  Histories of these parents included multiple rapes, the cutting of one father's throat with a machete, exposure to constant and unpredictable, life-threatening violence.  Yet for all, it was the rescuing of their children from terrible danger that was the prime motivation for the undertaking of the perilous journey to the United States.  All spoke of the efforts made to nurture and protect their children on the trip.  Most went without food or water in order to give those rations to their children.  Some who had been kidnapped on the journey wept in shame that they were not able to protect their children from the fearfulness of that experience.

As with any stressor, the impact of trauma is a product of the severity of the event (in this case, extremely severe) and the relative resilience of the victim. These parents arrived in the United States already worn down by circumstances which left them even more susceptible  to the destructive impact of the loss of their children.  All had endured a protracted period of fear and violence in their own countries before making the difficult decision to leave.  Wishing to keep their families safe, many had come with only part of their family and were forced to leave spouses and other children behind.  Despite having made provisions for them, all worried about and missed the family members not with them.  Many had endured tremendous physical hardship or violence before leaving and arrived physically weakened by a long journey with very little food or water.

All of the parents interviewed described severe symptoms arising from all four categories of traumatic response and qualified for the diagnosis of an Acute Stress Response.  [The categories of impairment for ASR are identical to those for PTSD.  However, at the time of their Credible Fear Interviews, one month had not yet passed since the trauma of child separation and so they did not yet qualify for the diagnosis of PTSD.]

All described "Intrusion Symptoms" with involuntary distressing memories of the moment their children were taken from them and the aftermath during which, in some cases, guards would behave cruelly, telling them that they would never see their children again.  Many had frank "flashbacks": A kind of waking nightmare in which the moment of separation would suddenly be relived, as if it was happening again. Some would "hear" the harsh words of the guards as if they were being spoken again and would turn around to find no one.   Nearly all had profoundly distressing dreams with content related to their situation: "I see my child and she is calling for me but I'm tied up in chains and can't get to her.  I scream for someone to help but nobody comes".  Most events in the course of the day would trigger associations to their trauma: for example, for many mealtime evoked the last time they'd eaten with their child or worry about whether their child was being fed and cared for.  All had severe sleep disturbances, not only because of nightmares which would jolt them awake but also because bedtime often invited the most obsessional reliving of the loss of their child and acute worries about his or her wellbeing.  All reported that these experiences and feelings left them exhausted, robbed them of their appetite, led to palpitations and headaches.

"Avoidance Symptoms" were less relevant in this population, as it was impossible to avoid associations with the original event.  But several spoke of seeing detention guards who reminded them of those who had taken their child and doing all they could to avoid encounters with these guards.

All described "Negative alterations in cognition and mood" related to the trauma.  Many were unable to defend against the fear that their children were being more actively harmed: physically or sexually abused.  All felt confused and uncertain about information given to them about their children.  All felt that they would never be the same again.  Many believed that at night they heard the sound of children crying or speaking despite there being no children in the detention

facility.  All described a persistent experience of profound suffering and misery and the inability to distract themselves even for a moment from the anxiety and depression which consumed them.  None was able to muster any interest in any activity not related to their children other than reading their bible for comfort.

All experienced "<u>Marked alterations in arousal and reactivity</u>".  This was generally manifest by a chronic experience of anxiety or fear with an exaggerated startle response.  All described difficulty relaxing or sitting still, most with a marked restlessness and tremulousness.  All reported palpitations and sleep disturbances beyond their obsessionality and nightmares.  All awoke frequently and/or early with difficulty getting back to sleep and a feeling of persistent dread upon awakening.

Taken together these symptoms resulted in significant both physiological and psychological impairments.  Many reported significant weight loss, general weakness and unwellness.  Many had persistent headaches.  Several had developed new gastrointestinal symptoms: abdominal pain and cramping, nausea, diarrhea.  Many felt chronically lightheaded.

Most notably within this context, all described an inability to think clearly: to process information, to organize information, to retrieve memories in full.  All described difficulty focusing, with many reporting frequently losing track of conversations, sometimes losing even the thread of their own thoughts or words.  None were able to describe priorities beyond that of getting their children back and none were able to think in broader, abstract strategic terms.  Despite all appearing highly engaged in our interviews which were open-ended and unpressured, many misheard or required repetition of questions.  All had difficulty processing or expressing some of their answers.

For those who had taken their Credible Fear Interview at the time of my assessment, all described the experience as painful and confusing.  Many reported that they'd informed the interviewers that they felt unable to answer the questions due to their distress over the loss of their children, but were told they must do so anyway, to "just answer yes or no".  Many have reported that they have little to no memory of the interview, that they were barely able to speak because they were weeping throughout, that they were unable to hear the questions because they were so distracted by their worry about their children, that they were unable to retrieve the information necessary to answer questions.


CONCLUSION: The parents I interviewed were severely impaired both cognitively and physiologically by the trauma they endured in the sudden, often violent removal of their children from their care and the attendant uncertainty of their children's whereabouts and well-being.  The impact of this trauma had been global and led to a myriad of impairments, several within the sphere of cognition.

These impairments would meet the legal definition of a "disability" in that that they substantially limited the capacity of these individuals to engage in an array of major life activities, including their Credible Fear Interviews.

As a consequence of symptoms arising from the trauma of their loss, these parents would not have been cognitively competent to process the questions or formulate answers to any fact-based, time-limited interview.   Indeed, their distraction by concerns for their children impaired even their ability to appreciate the importance of the interview in determining the fate of their asylum claims.

I believe the broad sample of parents interviewed (some married, others single, fathers and mothers, an age range from 27 to 48) may be fairly considered to represent the class of parents impacted by the extreme trauma of this child-parent separation.

In short, it is my professional opinion that all parents who endured the "zero tolerance" traumatic separation from their children and remain separated from them should be considered now and in the past incapable of perceiving and acting in their own interest, legally disabled, and cognitively too impaired to engage in a Credible Fear Interview.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Amy J Cohen MD                                                   08/15/18